**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| OPEN RANGE COMMUNICATIONS INC., | : Case No. 11-_____ (___) |
| | : |
| Debtor. | : |
| | : |

## DECLARATION OF CHRIS EDWARDS, CHIEF FINANCIAL OFFICER OF OPEN RANGE COMMUNICATIONS INC., IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Chris Edwards, hereby declare under penalty of perjury:

1.     I am Chief Financial Officer of Open Range Communications Inc. (the "Company," or the "Debtor"), a corporation organized under the laws of the State of Delaware In this capacity, I am familiar with the Debtor's day-to-day operations, businesses, financial affairs, and books and records.

2.     On the date hereof (the "Petition Date"), the Debtor filed with the Court a voluntary petition (collectively, the "Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its businesses and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     I submit this declaration (the "Edwards Declaration") to provide an overview of the Debtor and to support the Debtor's Petition and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this Edwards Declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and

advisors, or my opinion based on my experience, knowledge, and information concerning the Company's operations and financial condition. I am authorized to submit this Edwards Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. The First Day Motions are intended to enable the Debtor to operate effectively and seek relief aimed at, among other things, ensuring the continuation of the Debtor's business operations without interruption, preserving customer and vendor relationships, maintaining employee morale and establishing safeguards to promote a seamless transition into chapter 11. To familiarize the Court with the Debtor and the relief it will seek on the first day of this case, this Edwards Declaration is organized as follows: Part I provides an overview of the Debtor's business and recent performance. Part II provides a description of the Debtor's capital structure. Part III describes the events leading to the commencement of the chapter 11 case. Part IV describes the purpose of this chapter 11 case. Part V incorporates and affirms the facts that support the relief requested in the First Day Motions.

**PART I**

**I.     The Debtor's Business and Recent Performance**

5. Open Range Communications Inc. ("Open Range" or the "Company") was formed in October 2004 as a Delaware corporation with a mission to provide broadband access to unserved and underserved rural Americans. Open Range determined that the most cost effective broadband services in rural areas could be delivered using wireless networks. Between October 2004 and January 2009, the Open Range team pursued on two occasions a loan from the Rural Utilities Services of the United States Department of Agriculture (the "RUS") to fund build out of a wireless broadband network. The Company's efforts to secure licensed spectrum culminated with the execution of a Spectrum Manager Lease with GlobalStar Licensee LLC

2

("GlobalStar") on October 31, 2007. The GlobalStar lease provided the spectrum that the Company intended to use to reach up to 50 million people.

6.     In January 2009, the Company executed a $267 million Loan and Security Agreement ("RUS Loan Agreement") with the RUS that could be used over a five year period for specified capital expenditures to build its broadband network in 546 communities in 17 States (the "RUS Loan"). In connection with the RUS Loan, the Company received an equity commitment from One Equity Partners III, L.P. ("OEP") in the amount of $100 million to be funded in total on the closing of the transaction. This was the largest broadband loan ever awarded by RUS and the largest private equity investment supporting such a loan in the history of this program.

7.     The Company launched its first market nine months after closing on the RUS Loan, as required under the RUS Loan Agreement. Subscriber acquisition rates met or exceeded expectations through 2010, and at June 30, 2010 the Company was in 36 markets and passed 220,000 households.

8.     The Company's momentum was, however, substantially adversely affected by difficulties GlobalStar was having retaining the spectrum which the company was using for its services. This spectrum is known as ATC spectrum. The continued availability of this spectrum to Open Range was a condition under the RUS Loan Agreement. At issue was GlobalStar's ability to continue to meet FCC conditions on use of the spectrum which related to matters outside of Open Range's control. On December 15, 2009, GlobalStar submitted a request to the FCC to extend the performance deadlines required of GlobalStar, the first of which was scheduled for July 1, 2010. When no action was forthcoming from the FCC by June 2010, the RUS issued a termination notice to the Company concerning the RUS Loan. Also, in June 2010,

Open Range filed its own application to the FCC for Special Temporary Authority ("STA") seeking permission to continue using the GlobalStar spectrum pending action by the FCC on the GlobalStar request. The FCC twice extended the GlobalStar compliance deadlines but on September 14, 2010 the FCC temporarily suspended GlobalStar's authority to lease ATC spectrum to Open Range and others until it came into compliance with FCC requirements. At the same time, the FCC granted Open Range an STA for 60 days to continue using the GlobalStar spectrum. However, the FCC limited the expansion of the Open Range system, using the GlobalStar spectrum, to 264 markets until a different spectrum solution became available. In addition, the FCC required the Company to demonstrate it was undertaking reasonable efforts to find alternative spectrum arrangements as a condition to any renewal of the STA.

9. The RUS termination notice to GlobalStar, and the limited initial 60 day STA, created significant uncertainty with vendors and suppliers and caused some vendors to reduce efforts or altogether exit projects which led to a general slowdown of construction and deployment activity.

10. The Company experienced problems in network quality which further slowed down progress compared to its original plans. The wireless network the Company uses was built and maintained under turn-key arrangement with Alvarion, who also supplied much of the radio equipment and customer premises equipment necessary for Open Range to service customers. In short, the system performance the Company contracted from Alvarion was never achieved. The technical failures of the Alvarion equipment, and design and implementation issues on the network which has been reliant on a relatively limited band of spectrum, further negatively impacted the Company's plans. Indeed, subscribers per sector that could be served were reduced

49524/0001-7932843v5

by as much as 50% over that expected to be delivered, and in many other respects the network failed to achieve contractual specifications.

11.    In view of the uncertainty associated with its spectrum, the Company engaged in intensive efforts to find spectrum alternatives. By the fourth quarter of 2010, Open Range began making significant progress on this front. These efforts included discussions with LightSquared, an owner of wireless spectrum (included the signing of a letter of intent on November 30, 2010 to be the exclusive rural partner for LightSquared), and Clearwire ("CLWR"), seeking either an affiliate relationship or potentially a direct spectrum purchase through CLWR's auction process.

12.    As a consequence of the network issues and vendor challenges described above, in late 2010 the Company reevaluated its business plans. Substantial changes in the plan were made to account for costs associated with new spectrum needs, the challenges with the performance of the existing network, other ongoing operating difficulties encountered and corresponding cash burn.

13.    Between June 2010 and April 2011, the flow of funding from the RUS became more sporadic. Funding from the RUS is dependent upon various activities and can take two distinct forms, 1) advances against pre-approved contracts, and 2) reimbursement of operating funds expended by the Company. Open Range was burdened by RUS procedures that only allowed the processing of funding requests in a serial manner, with only one funding request accepted per month. The consequence was a funding request backlog which generated significant pressure on many business partners and led to further vendor difficulties and cash flow challenges.

14.    In April 2011, after 3 months of discussion and negotiation with the RUS, the Company entered into an amendment to the RUS Loan Agreement (the "RUS Amendment")

5

which limited the Company's construction to 160 markets pursuant to a new business plan (the "New Plan") and reduced the RUS Loan commitment to $180 million. On April 29, 2011, OEP agreed to contribute $40 million pursuant to an equity commitment ("OEP Commitment") with an initial funding of $10 million.

15.    Since April 2011, only one funding request of the RUS for $4.6 million has been processed for reimbursement of operating expenses incurred in 2011. Currently, the Company estimates there is approximately $15 million in items that have not been submitted to the RUS for processing including $9 million for funds already disbursed by the Company.

16.    The Company maintains its headquarters in Greenwood Village, Colorado. Following recent significant workforce reductions, the Company employs approximately 48 employees and still operates in 12 states, including Wisconsin, Arkansas, Illinois, Georgia, South Carolina, Pennsylvania, Colorado, Indiana, Alabama, California, Ohio and Delaware and maintains a customer base of approximately 26,000 subscribers.

17.    As of September 30, 2011, the Debtor's books and records reflected total combined assets of approximately $114 million and total combined liabilities of approximately $110 million. For the fiscal year ending December 31, 2010, the Company had revenue of $1,738,895 and a loss from operations of $50,371,397.

## PART II

**II.    Capital Structure of the Debtor**

18.    The Company's capital structure consists of secured debt, unsecured debt and equity. As of the Petition Date, its secured debt is approximately $74 million and unsecured debt is approximately $36 million.

19.    On or about January 9, 2009, the Company entered into the RUS Loan Agreement with the United States of America, acting through the RUS for loans in the

6

aggregate amount of $267 million. The Company pledged, assigned and transferred to RUS a continuing security interest in and to all of the Debtor's property as part of the RUS Loan Agreement. Pursuant to the RUS Loan Agreement, the Company also established a deposit account pledged to RUS that holds the proceeds from the RUS Loan (the "Deposit Account") which are to fund advances on pre-approved contracts. On or about April 29, 2011, the Company and the United States of America entered into the RUS Amendment with a reduced loan commitment of $180 million covering the New Plan. As of the Petition Date, there is approximately $4.9 million in the Deposit Account and the secured debt owed to RUS is approximately $74 million.

20.     The Company's estimated unsecured liabilities as of the Petition Date are $36 million, including $15 million of amounts that the Company believes would be eligible for reimbursement by the RUS.

21.     As of the Petition Date, OEP (directly or through an affiliate) contributed $23.4 million of the $40 million under its April equity commitment and also $1 million on October 5, 2011 (which remains undetermined as to whether this is debt or equity) and has outstanding management fees of $2,787,810, payment of which is contingent upon repayment in full of the RUS Loan.

22.     The Company is authorized to issue 155,000,000 shares of common stock, $0.001 par value and 67,114,177 shares of preferred stock, $0.001 par value. The Company has issued 2,367,423 shares of common stock held by insiders as well as third parties. The Company also has issued 43,518,937 shares of preferred stock held by insiders as well as third parties. OEP (through an affiliate) holds 97% of Series B Preferred Stock and 99.6% of the Series C Preferred Stock. There is no public market for the equity securities of the Company.

49524/0001-7932843v5

**III.    Events Leading to the Chapter 11 Case**

23.    Despite a myriad of corporate initiatives, the Company's business results precipitously declined and it has failed to achieve the customer, revenue, EBITDA and other target set in its New Plan. These initiatives included headcount reductions, network grooming and lease cost reduction initiatives, network optimization activities, and significant changes in business processes. The Company's failures to achieve the New Plan are based upon, among other things: 1) continued network and self-interference issues, which have not been remedied by Alvarion; 2) resulting inability to effectively add and service customers and a poor customer experience; and 3) resulting higher than forecasted bad debt and non-paying customers. Posing an additional challenge, the alternative spectrum opportunity with LightSquared has been delayed as a result of continuing GPS interference issues. The Company's repeated efforts to reach a CLWR spectrum transaction on terms acceptable to the Company have also been unsuccessful.

24.    On August 25, 2011, the Company retained FTI Consulting, Inc. ("FTI") to perform due diligence on the New Plan. FTI, in consultation with Company management, determined that the New Plan was not achievable and that no feasible plan could likely be envisioned without affordable additional or replacement spectrum and technology that met needed specifications and, as a result, it was necessary to take immediate action to preserve cash and evaluate strategic alternatives.

25.    On September 19, 2011, following an initial evaluation made to the Open Range Board, FTI's engagement scope was expanded to cover assisting the Company with, among other things, the development and implementation of go forward financial plan options,

implementation of cash preservation activities, strategic development and negotiation with key financing parties and key vendors, and the identification, evaluation and implementation of performance enhancement initiates. FTI provided its initial report to the Board on September 21, 2011. After review of this report the Board constituted a Restructuring Committee of the Board made up of four members of which three are outside directors not affiliated with the Company or OEP. Assuming no further funding, the Company would have run out of cash by the end of September 2011 due to the Company's existing cash burn rates.

26. Members of the Company's Board and Company advisors met with the RUS on September 22, 2011 to advise them of the Company's financial position and to discuss the possibility of additional funding from RUS. At that meeting, the RUS advised Open Range that the RUS would likely be seeking reimbursement of funds RUS believes were improperly advanced to Open Range. RUS estimated the amount at approximately $23 million. This amount was subsequently clarified in a report to the Company received on October 4, 2011 to represent disallowances of $698,745 and documentation issues that if not rectified could result in further disallowances of approximately $19.6 million. The Company's advisors also had a follow up telephonic conversation with the RUS on September 30, 2011 and apprised RUS of the very limited operating options available to the Company and the rapidly dwindling cash resource of the Company. The RUS stated that it will not advance additional funds to Open Range. On October 5, 2011, the Company reduced its head count from 174 to 48 employees to oversee the operation of the network and maintain the current customer base. The Company negotiated a separation with its former CEO, William Beans, Jr. Mr. Beans will continue to provide limited consulting services, as needed by the Company, for up to six months from the Petition Date.

9

27.    On October 5, 2011, OEP (directly or through an affiliate) provided $1 million in funding. At the time of the filing, the characterization of this funding has not been made clear to the Company. The Company has forecast a $6 million funding need to effect the purposes of this chapter 11 case described below. It believes that OEP is the only source of this funding and has requested OEP to fund this amount. OEP has stated that it has no further obligations to fund under the OEP Commitment, but discussion on continued funding are in process.

**PART IV**

## IV.    Purpose of Chapter 11 Case

28.    The Company filed for bankruptcy to utilize the benefits of the automatic stay and other Bankruptcy Code protections to effectuate either (i) a section 363 sale of substantially all of its assets as a going concern or sales for select assets (the "Sale") or (ii) a wind-down of its business operations through a liquidation in chapter 11. During the first 30 days of this case, the Company will market its assets to determine whether there are any potential bidders for the Sale. If the sale process is unsuccessful, then the Company will immediately shut down its network and begin a wind-down of its operations. The Company estimates that it will then take approximately three (3) months to complete a wind-down of operations with the assistance of a limited group of employees. The Company plans to seek approval for an employee incentive plan to incent the minimal staffing and management remaining during this transition period.

29.    After the Petition Date, the Company will no longer accept new customers but will continue to service those existing customers through a Sale or shutdown of the network. On the Petition Date, the Company plans to send a notice as required by applicable FCC regulations to each of its VOIP (telephone) customers (approximately 8,000) that service may possibly be discontinued in 31 days. In addition, the Company intends to continue to reduce its

10

fixed costs by, among other things, rejecting tower leases, office leases and numerous contracts. Effective as of the Petition Date, the Debtor seeks to reject approximately 21 leases and 161 contracts in an effort to reduce its costs.

**PART V**

**V.      Facts Relevant to and Support for First Day Motions**

30.      As discussed above, the Debtor has entered the chapter 11 process with the goal of stabilizing its operations and ensuring a smooth transition into chapter 11. To that end, concurrently with the filing of its chapter 11 petition, the Debtor has filed a number of First Day Motions seeking relief that the Debtor believes is necessary to enable it to operate with minimal disruption and loss of productivity. The Debtor requests that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtor's operations during the pendency of this case. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[1]

**A.      Motion of the Debtor for Entry of an Order Authorizing the Retention and Employment of Logan & Company, Inc. as Claims, Noticing, and Balloting Agent (the "Logan Retention Motion")**

31.      By the Logan Retention Motion, the Debtor requests entry of an order authorizing the employment and retention of Logan as the Claims, Noticing and Balloting Agent under the terms and conditions of the agreement dated October 2, 2011 between the

---

[1] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

49524/0001-7932843v5

Debtor and Logan (the "Services Agreement"), subject to any restrictions set forth in the proposed order approving the Logan Retention Motion.

32.     I have been advised that Local Rule 2002-1(f) requires a debtor to file a motion to retain a claims and noticing agent within ten (10) days of the Petition Date in all cases with more than 200 creditors. Since the Debtor has more than 200 creditors, the filing of the Logan Retention Motion is appropriate in this case.

33.     Pursuant to the Services Agreement, and as is more fully set forth in the Logan Declaration, Logan will act as the Claims, Noticing, and Balloting Agent in this case. As Claims, Noticing, and Balloting Agent, Logan will provide comprehensive administrative-support services to the Court, the Debtor, and other parties-in-interest in this chapter 11 case. These services include, but are not limited to: (i) serving required notices in this chapter 11 case; (ii) maintaining all proofs of claim and proofs of interests filed in this chapter 11 case (collectively, the "Claims"); (iii) docketing all the Claims; (iv) maintaining and transmitting to the Clerk the official claims registers; (v) maintaining current mailing lists of all entities that have filed Claims and notices of appearance; (vi) providing the public access for examination to all Claims at its premises during regular business hours and without charge; (vii) recording all transfers of claims; and (viii) providing balloting and plan solicitation services related to the Debtor's chapter 11 plan.

34.     In consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtor's business, and the scope of the tasks for which the Debtor will require the assistance of a claims, notice and balloting agent, the Debtor concluded that the retention of Logan is in the best interests of the Debtor's estate, its creditors, parties-in-interest, and this Court. Based on Logan's substantial experience in providing similar services in other

12

large chapter 11 cases, including noticing, claims processing and reconciliation, and plan voting and distribution services, I believe that Logan is eminently qualified to serve as Claims, Noticing, and Balloting Agent in this chapter 11 case.

35.    I further believe that the relief requested in the Logan Retention Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its businesses in chapter 11 without disruption.

36.    Accordingly, on behalf of the Debtor, I respectfully submit that the Logan Retention Motion should be approved.

**B.    Motion of the Debtor for an Order (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, and (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion")**

37.    By the Cash Management Motion, the Debtor seeks entry of an order (i) authorizing the Debtor's continued use of its existing cash management system, (ii) authorizing the Debtor to continue using its existing bank accounts and business forms, and (iii) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtor's deposit and investment practices.  In connection with this relief, the Debtor also seeks a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that generally require the Debtor to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new business forms and stationery reflecting the Debtor's status as debtor-in-possession.

38.    In the ordinary course of business, the Debtor uses a centralized cash management system to collect funds from its operation and to pay operating and administrative expenses, (the "Cash Management System").  The Cash Management System is similar to the centralized cash management systems used by other companies to collect, transfer, and disburse

13

funds in a cost-effective and efficient manner. The Cash Management System is carefully managed through oversight procedures and controls implemented by the Debtor's accounting department. Through its control over the Cash Management System, the Debtor is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect the collection, disbursement, and movement of cash.

39. With respect to the Debtor's operations, the Cash Management System consists of six (6) Bank Accounts held by the Debtor as follows: (i) a checking account with JPMorgan Chase & Co. ("JPM Chase") that is the Debtor's main operating account (the "Main Operating Account"); (ii) a checking account with TD Bank, N.A. ("TD Bank," and together with JPM Chase, the "Cash Management Banks") that was established as a requirement from the loan with the RUS (the "RUS Account"), (iii) a deposit account with JPM Chase (the "Depository Account") established solely to receive certain customer payments, (iv) two investment accounts (each, an "Investment Account" and collectively, the "Investment Accounts") and (v) one savings account with JPM Chase (the "Savings Account"). The Main Operating Account is funded by payments from the Debtor's customers and is used to pay the Debtor's operational expenses, including payroll and ordinary accounts payable obligations. The RUS Account was established pursuant to a deposit control agreement between the Debtor and RUS. The Depository Account is used solely to accept certain customer payments, and both the Savings Account and Investment Accounts were established during the formative years of the Debtor and are dormant accounts.

40. The Debtor seeks authority to continue using the Cash Management System on a postpetition basis as more fully described in the Cash Management Motion. It is critical that

49524/0001-7932843v5

the Debtor remains able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate its business operations. Disrupting the Debtor's current cash management procedures would impair the Debtor's ability to preserve and enhance its respective going concern value and to successfully reorganize during this chapter 11 case.

41.     The Cash Management System allows the Debtor to centrally manage all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as its creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtor will continue to maintain detailed records reflecting all postpetition transfers of funds. Any changes to the Debtor's bank accounts or its treasury systems that report on account activity and generate wire transfers would be disruptive to the Debtor's business operations and could undermine the effectiveness of such systems.

42.     Therefore, it is both essential and in the best interests of the Debtor's estate and creditors that the Cash Management System be maintained. Furthermore, the Debtor's reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would be associated with disruptions in the Centralized Cash Management System.

43.     I have been advised of the restrictions imposed by section 345(b) of the Bankruptcy Code. To the extent applicable, the Debtor requests that the Court waive the requirements of section 345(b) on an interim basis and permit it to continue investing funds in the Bank Accounts in accordance with its prepetition practices. All of the Bank Accounts that the Debtor seeks to continue to use are federally insured. Given that the Bank Accounts are

15

domestic business accounts and considering the relative security of the Cash Management System, I believe that such funds are not at risk.

44.     I have also been advised of the U.S. Trustee Guidelines requiring the Debtor to comply with the requirement that chapter 11 debtors close all existing bank accounts after filing a petition for reorganization and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee. I believe this requirement would create significant and undue hardship on the Debtor. Transferring bank accounts will be disruptive, time consuming and expensive. The Debtor therefore seeks a waiver of the U.S. Trustee requirement that its bank accounts be closed and that new postpetition bank accounts be opened.

45.     In sum, the Debtor needs to maintain its Centralized Cash Management System in order to ensure smooth collections and disbursements in the ordinary course of its business. It is critical that the Debtor remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate its business operations. Disrupting the Debtor's current cash management procedures would impair the Debtor's ability to preserve and enhance its respective going concern value and to successfully reorganize during this chapter 11 case.

46.     Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

16

**C.** **Motion of the Debtor for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, Commissions and Other Compensation; (B) Payment of Prepetition Compensation Owed to Independent Contractors; (C) Reimbursement of Prepetition Employee Business Expenses; (D) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (E) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (F) Continuation of Workers' Compensation Policies; and (G) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtor's Payroll Accounts to Make the Foregoing Payments (the "Employee Motion")**

47.     By the Employee Motion, the Debtor seeks entry of an order (i) authorizing, but not directing, the Debtor, in accordance with its stated policies, to: (a) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtor's Employees (as defined below); (b) pay all prepetition compensation owed to individuals who work regularly as the Debtor's independent contractors ("Independent Contractors"), or for temporary employment agencies who provide Independent Contractors to the Debtor; (c) reimburse all prepetition business expenses to current Employees and terminated Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) continue workers' compensation policies; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's operating account to make the foregoing payments.

48.     After recent reductions in force, as of the Petition Date, the Debtor currently employs 48 employees (the "Employees"). In addition, the Debtor utilizes certain Independent Contractors. The Employees' and Independent Contractors' skills, knowledge, and

17

understanding of the Debtor's business is the Debtor's most valuable asset. Without the continued services of the Employees, the Debtor's chapter 11 efforts will not be possible.

49. I have been advised that the Employee Wages and Benefits that the Debtor seeks to pay with respect to the Unpaid Wages and Reimbursable Expenses (including Reimbursable Expenses owed to Terminated Employees) are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $11,750.00 per Employee or Independent Contractor. Thus, I have been further advised that granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims.

50. Furthermore, prior to the Petition Date, the Debtor employed direct sales representatives and managers (collectively, the "Sales Force") in various markets to obtain new customers. The Sales Force was terminated prior to the Petition Date and will not be utilized postpetition. The compensation for the Sales Force was commission-based (the "Commissions"). I have been advised that the Commissions the Debtor seeks to pay those individuals on the Sales Force are entitled to priority status under sections 507(a)(4) of the Bankruptcy Code, to the extent they do not exceed $11,750.00 to any individual on the Sales Force. Thus, I have been further advised that granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims. In addition, to maintain its reputation in the various markets in which the Sales Force is located, I believe it is necessary for the Debtor to pay the Commissions.

51. The Employee Benefits include the PTO Bank and Severance Policy. The PTO Bank is the accrued time off the Debtor provides each period, based on tenure. The PTO Bank may be used for vacation, sick days, or personal days, and are requested through the Debtor's

18

human resources system. Upon termination or resignation, Employees receive payment based on the accrued and unused PTO Bank amount earned at the time of separation from employment. Any PTO time taken in excess of the earned, accrued PTO Bank is deducted from the Employee's final paycheck. Under the prepetition Severance Policy, the Employees were eligible for a severance payment depending upon years of service and level but at a minimum of two weeks (the "Severance Policy").

52. By the Employee Motion, the Debtor requests authority, among other things, to continue (i) the Severance Policy, subject to a modification that the amount of severance shall be equivalent to only two weeks of the applicable Employee's salary, and (ii) the PTO Bank policies and procedures. Retention of the Employees is one of the top priorities in this chapter 11 case. I believe continuation of the Severance Policy (as modified) and the PTO Bank is necessary for Employee morale and/or keeping the Employees incentivized for this chapter 11 case.

53. The Deductions and the Payroll Taxes principally represent Employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees and an administrative burden for the Debtor. Indeed, the Debtor expects inquiries from garnishors regarding the Debtor's failure to submit, among other things, child support and alimony payments that are not the Debtor's property, but, rather, have been withheld from Employees' paychecks on such parties' behalf. Moreover, if the Debtor cannot remit these amounts, I have been advised that the Employees may face legal action due to the Debtor's failure to submit such payments.

19

54. I have also been advised that maintaining the Workers' Compensation Policies is justified because applicable states or other governmental entities mandate this coverage. Furthermore, with respect to workers' compensation claims, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a severe effect on the financial well-being and morale of the Debtor's Employees and their willingness to remain in the Debtor's employ.

55. Furthermore, the majority of the Debtor's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses (including the Health Care Programs, Insurance Programs, and 401(k) Plan) to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtor is unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, I believe the Employees may seek alternative employment opportunities, thereby hindering the Debtor's chapter 11 efforts.

56. In addition, the Debtor requests that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related to the Employee Wages and Benefits and the Reimbursable Expenses, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date. The Debtor represents that these checks are drawn on identifiable bank accounts. Accordingly, checks other than those for the Employee Wages and Benefits and the Reimbursable Expenses will not be honored inadvertently. Moreover, the Debtor represents that it has sufficient cash reserves, together with

49524/0001-7932843v5

anticipated access to debtor in possession financing, to promptly pay all of the Employee Wages and Benefits and the Reimbursable Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of their businesses.

57. In sum, the Employees' skills and their knowledge and understanding of the Debtor's infrastructure, operations and customer relations are essential to the continued operation of the Debtor's business. Without continued services of the Employees, this chapter 11 will not be possible.

58. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Motion should be approved.

**D. Motion of the Debtor for an Order Authorizing the Debtor to Honor Customer Guarantee Program and Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Programs Motion")**

59. By the Customer Programs Motion, the Debtor requests the entry of an order granting the Debtor authority to (i) perform their prepetition obligations related to the Customer Programs (as defined below) as they determine advisable, and (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs, as the Debtor determines advisable, in the ordinary course of business and without further application to this Court.

60. Prior to the Petition Date, and in the ordinary course of its business operations, the Debtor engaged in certain practices to develop and sustain a positive reputation with its customers and in the marketplace for their products (collectively, the "Customer Programs"). The Customer Programs, many of which are customary in the Debtor's industries, include among others, vendor programs, pre-payments and adjustments. Each of these Customer Programs is described in greater detail in the Customer Programs Motion. The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and

49524/0001-7932843v5

generate goodwill for the Debtor, thereby retaining current customers, and ultimately enhancing the Debtor's revenue and profitability.

61.     The Debtor desires to continue during the postpetition period those Customer Programs that they believe are beneficial to its businesses. The Debtor believes, and I agree that such relief is necessary to preserve critical customer relationships. Indeed, the total operational and administrative cost to the Debtor to continue the Customer Programs is relatively insignificant when compared to the revenue that the Debtor generates from its customers. Accordingly, the Debtor is seeking the authority to continue the Customer Programs on a postpetition basis in the ordinary course of business.

62.     In addition, in light of the fact that some of the Customer Programs, as they relate to prepetition arrangements between the Debtor and its customers, may represent unperformed prepetition obligations, the Debtor is seeking this Court's authorization to perform all prepetition obligations under the Customer Programs. Because the industry in which the Debtor operates is highly competitive, some of the Debtor's customers may cease to purchase the Debtor's products and may turn to other sources if the Debtor fails to timely perform its prepetition obligations under the Customer Programs. Therefore, unless the Debtor is able to assure its customer base that it will honor the Customer Programs during this chapter 11 case, the customers may seek alternative suppliers, which would result in an immediate loss of revenue and cash flow for the Debtor.

63.     Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Program Motions should be approved.

49524/0001-7932843v5

**E.     Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and (II) Authorizing Banks to Honor Related Checks and Electronic Transfers (the "Taxes Motion")**

64.     In the ordinary course of business, the Debtor is subject to various taxes, regulatory fees, and related obligations that are payable directly to numerous state and local taxing authorities, and certain federal governmental agencies (collectively, the "Taxing Authorities"). By the Taxes Motion, the Debtor seeks entry of interim and final orders authorizing it to pay in the ordinary course of business, in its discretion, the various taxes and related obligations that accrued or that arose before the Petition Date that will become due during the pendency of this case.

65.     The Debtor seeks the relief requested in the event and to the extent that: (a) the various taxes and related obligations that accrued prior to the Petition Date: (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost or otherwise not received in full by any Taxing Authority, or (c) any taxes and related obligations accrued or were incurred prepetition that will become due during the pendency of this case in the ordinary course of business. The Debtor estimates that as of the Petition Date, its accrued and unpaid prepetition taxes were approximately $177,000.

66.     The Debtor further requests that the order approving this Motion authorize applicable banks and financial institutions (the "Banks") to honor and process electronic transfers or checks issued by the Debtor on account of any prepetition taxes that have not cleared as of the Petition Date, and to rely on the Debtor's representations as to which checks

23

are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtor's instructions.

67.    Payment of the prepetition Taxes is critical to the Debtor's continued, uninterrupted operations.  Furthermore, I have been advised that the Debtor's failure to pay the Taxes could affect adversely the Debtor's business operations because the Taxing Authorities could suspend the Debtor's operations, file liens, or seek to lift the automatic stay.  In addition, certain Taxing Authorities may take precipitous action against the Debtor's directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtor's chapter 11 efforts.

68.    Consequently, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

69.    Accordingly, on behalf of the Debtor, I respectfully submit that the Taxes Motion should be approved.

**F.    Motion of the Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

70.    By the Utilities Motion, the Debtor seeks entry of an interim and final order: (i) prohibiting the utility providers from altering, refusing or discontinuing service to the Debtor on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) providing that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, inter alia, on the Debtor's establishment of a segregated account containing an amount equal to fifty percent

24

(50%) of the Debtor's estimated average monthly cost of utility service, which may be adjusted by the Debtor for reasons specified herein following the final hearing on this Motion; and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtor to provide adequate assurance of future payment to the Utility Providers.

71.     In connection with the operation of their businesses and management of its properties, the Debtor obtains electricity, gas, internet, and telephone, and/or other similar services (collectively, the "Utility Services") from a number of utility providers (collectively, the "Utility Providers"). Annexed to the Utilities Motion as Exhibit C is a nonexclusive list of approximately 23 Utility Providers (many of whom have multiple accounts) that provide Utility Services to the Debtor as of the Petition Date. The relief requested in the Utilities Motion is for all Utility Providers providing Utility Services to the Debtor and is not limited to those listed on the Utility Service List. The Debtor reserves the right to amend the Utility list to designate certain telecommunications providers (who are believed to be under contract to perform their services) as a Utility Provider.

72.     To provide adequate assurance of payment for future services to the Utility Providers as set forth in section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit an initial sum equal to fifty percent (50%) of the Debtor's estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit"), into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account") within twenty (20) days of the Petition Date, pending further order of this Court. Because the Debtor's approximate monthly spending on Utility Services is approximately $68,538 the Adequate Assurance Deposit will be approximately $34,269.

49524/0001-7932843v5

73.     The Debtor submits that the Adequate Assurance Deposit, together with the Debtor's ability to pay for future Utility Services in the ordinary course of business with its post-petition financing (collectively, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Companies, especially in light of the anticipated short length of this chapter 11 case. Accordingly, upon entry of the final order, any Utility Provider that has failed to submit a request for the Proposed Adequate Assurance or otherwise file an Objection to the Utilities Motion as described below, shall be deemed to have been provided with adequate assurance of payment as required by section 366 of the Bankruptcy Code and shall be prohibited from discontinuing, altering, or refusing to provide Utility Services, including as a result of unpaid charges for prepetition Utility Services.

74.     The Debtor further requests that this Court order that pending a final hearing on the Utilities Motion, all Utility Providers are prohibited from discontinuing, altering, or refusing service to the Debtor, or discriminating against, the Debtor on account of the commencement of this chapter 11 case or any unpaid prepaid charges.

75.     I believe and am advised that the proposed Adequate Assurance Procedures set forth in the Utilities Motion are necessary in the chapter 11 case, because if such procedures are not approved, the Debtor could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of the chapter 11 case. I have been further advised that the proposed Adequate Assurance Procedures protect the Debtor without materially prejudicing the Utility Providers.

76.     I believe that uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of this case. Discontinuation of utility service could essentially shut down operations, and force the Debtor into immediate liquidation. Indeed, any

26

interruption of utility services, even for a brief period of time, would negatively affect the Debtor's operations, customer relationships, revenues, profits, seriously jeopardizing the Debtor's chapter 11 efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during the chapter 11 case.

77.     Furthermore, the Debtor requests authorization to continue using its automatic debit payment system to pay Utility Providers for Utility Services provided after the Petition Date. The Debtor has approximately 30 Utility Providers and 419 separate accounts. Considering the high number of Utility Providers and accounts, the Debtor's reliance on Utility Services for its business, and the administrative burden of separately arranging payment for each Utility Provider, the Debtor's practice has been to pay certain Utility Providers by automatic debit transaction from its main operating account. I believe it would be unduly burdensome on the Debtor, who has limited staffing available, to separately arrange for payment on each account. Consequently, maintenance of automatic debit transactions is essential and is in the best interests of all creditors and other parties-in-interest.

78.     Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

**G.     Motion of the Debtor for an Order Authorizing the Payments to Certain Critical Vendors on Account of Their Prepetition Claims (the "Critical Vendor Motion")**

79.     By this Critical Vendor Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004: (i) authorizing the Debtor, in its discretion, to make payments to certain Critical Vendors on account of their prepetition claims, subject to the terms and conditions set forth herein; and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay any

27

and all checks and transfer requests evidencing amounts paid by the Debtor under the Order whether presented prior to or after the Petition Date.

80.    Certain vendors (the "Critical Vendors") have claims for providing (i) essential services that were rendered to, or on behalf of, the Debtor before the Petition Date, and/or (ii) goods to the Debtor that were received by the Debtor before the Petition Date (collectively, the "Critical Vendor Claims"). By this Critical Vendor Motion, the Debtor seeks entry of an order authorizing the Debtor, in its discretion, to make payments to certain Critical Vendors on account of their prepetition claims, subject to the terms and conditions set forth herein, in an aggregate amount not to exceed $100,000 (the "Critical Vendor Cap"). Given the paramount importance of the goods and/or services provided by the Critical Vendors, and in order to ensure that the Debtor continues to receive such goods and/or services, it is imperative that the Debtor is permitted to pay the Critical Vendor Claims.

81.    I believe that payment of the Critical Vendor Claims is vital to the Debtor's chapter 11 efforts because, in most instances, the Critical Vendors are the only source from which the Debtor can procure certain goods and services within a timeframe and at a price that will permit the Debtor to continue operating its business and achieve its chapter 11 goals. A failure to pay or partially pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtor postpetition, and may force the Debtor into an immediate shutdown and liquidation.

82.    The Debtor has examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtor has access to adequate amounts of trade credit on a postpetition basis. Specifically, the Debtor has reviewed its accounts payable and has undertaken a thorough process to identify only those vendors who are essential to the Debtor's

operations. The Debtor has also developed certain procedures (for which they seek this Court's approval) that when implemented, will ensure that vendors receiving payment or partial payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtor's operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings.

83.      Along with other members of the Debtor's management team and financial and legal advisors, I have identified those vendors that are most essential to the Debtor's operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations or circumstances prevent the Debtor from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole source provider, whether the Debtor can continue operating without such vendor while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a), (b) or (c) is likely to refuse to continue providing goods or services to the Debtor postpetition if its prepetition outstanding balances are not paid.

84.      I believe that authority to pay the Critical Vendor Claims is vital to the Debtor's chapter 11 efforts. If this Critical Vendor Motion is not granted, the Debtor believes that it may be forced to shut down its operations. Indeed, such a result would cause immediate and irreparable damage to the Debtor and its estate.

85.      Accordingly, on behalf of the Debtor, I respectfully submit that the Critical Vendor Motion should be approved.

49524/0001-7932843v5

**H. Motion of the Debtor for an Order (I) Rejecting Certain Unexpired Leases of Nonresidential Real Property and (II) Rejecting Certain Executory Contracts, Pursuant to 11 U.S.C. § 365 (the "Lease Rejection Motion")**

86. By the Lease Rejection Motion, the Debtor seeks entry of an order (i) rejecting the leases of nonresidential real property for locations listed on Exhibit A to the proposed order submitted herewith (the "Leases") and (ii) rejecting (a) the executory contracts listed on Exhibit B to the proposed order submitted herewith (the "Tower Space Agreements") and (b) the executory contracts listed on Exhibit C to the proposed order submitted herewith (the "Circuit Contracts," and, together with the Tower Space Agreements, the "Contracts"), all effective nunc pro tunc to the Petition Date.

87. Pursuant to the 21 Leases that are the subject of the Lease Rejection Motion, the Debtor once utilized office space at the Lease locations. The Debtor has discontinued use of the Lease premises. Because the Debtor no longer uses or occupies these sites, it has determined, in its business judgment, that these sites are not necessary to the Debtor's ongoing operations. However, the Debtor currently remains obligated under the respective Leases.

88. The Debtor seeks to reject the Leases effective nunc pro tunc to the Petition Date. By obtaining authority to reject the Leases nunc pro tunc to the Petition Date, the Debtor will avoid incurring unnecessary administrative expenses for rent and other charges that provide no tangible benefit to the Debtor's estate.

89. Pursuant to the 161 Contracts that are the subject of the Lease Rejection Motion, the Debtor (i) contracted for services for circuits used by the Debtor to receive and transmit telecommunications signals pursuant to the Circuit Contracts and (ii) contracted for space at certain tower facilities for the transmission of wireless voice and data communications signals pursuant to the Tower Space Agreements. Because the Debtor no longer uses these circuits or

30

tower facilities, it has determined, in its business judgment, that these Contracts are not necessary to the Debtor's ongoing operations. However, the Debtor currently remains obligated under the respective Contracts.

90. The Debtor does not need the circuits or tower space associated with the Contracts and, therefore, the Debtor has concluded, in its business judgment, that the Contracts provide no value to the Debtor. The resultant savings from the rejection of the Contracts will favorably affect the Debtor's cash flow. By obtaining authority to reject the Contracts nunc pro tunc to the Petition Date, the Debtor will avoid incurring unnecessary administrative expenses for fees and other charges that provide no tangible benefit to the Debtor's estate.

91. I believe, in the exercise of sound business judgment, that the proposed rejection of the Leases and Contracts is tailored to minimize administrative expenses, maximize distributions to creditors in these cases and return property to the respective lessors quickly. Furthermore, the Debtor has taken affirmative steps to surrender and abandon the lease locations to its lessors and provide unequivocal notice of the Debtor's intent to reject the Leases and Contracts.

92. Here, the Debtor has complied with each of these requirements for nunc pro tunc rejection of the Leases, other than the requirement of committee approval, which cannot yet be satisfied since a committee has not yet been appointed. As of the Petition Date, the Debtor vacated each of the premises and sent the keys thereto to each of the respective lessors. As of the date of filing of the Lease Rejection Motion, the Debtor has advised each of the lessors to the Leases of the Debtor's intent to vacate and abandon its respective rights and interests under the various Leases. The Debtor provided a copy of the Lease Rejection Motion to each of the

31

lessors to the Leases, and waives its right to withdraw the Lease Rejection Motion prior to any hearing thereon.

93.     Although NAMCO factors do not explicitly apply to the rejection of executory contracts, the Debtor submits that it has also substantially complied with the NAMCO factors with respect to the Contracts—the Debtor has vacated the tower lease facilities, advised each of the Contract counterparties of the Debtor's intent to reject the Contracts, and provided a copy of the Lease Rejection Motion to each of the Contract counterparties at the time the Lease Rejection Motion was filed.  The Debtor reserves the right to negotiate with each of the Contract counterparties and resolve any disputes regarding the Lease Rejection Motion prior to the hearing.

94.     Accordingly, on behalf of the Debtor, I respectfully submit that the Lease Rejection Motion should be approved.

49524/0001-7932843v5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 5, 2011

Chris Edwards
Chief Financial Officer
Open Range Communications Inc.