# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| OPEN RANGE COMMUNICATIONS INC., | : | Case No. 11-13188 (KJC) |
|  | : |  |
| Debtor.[1] | : |  |
|  | : |  |

## MOTION OF THE DEBTOR FOR ENTRY OF
## INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND FED. R. BANKR. P. 2002, 4001, 9014 AND 9019 (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING AND (II) SCHEDULING A FINAL HEARING

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves this

Court (the "Motion") for entry of an interim order (the "Interim Order"), in substantially the

form attached hereto as Exhibit A, and a final order (the "Final Order" and together with the

Interim Order, the "DIP Orders") pursuant to sections 105(a), 361, 362, 363(b), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (as amended, the

"Bankruptcy Code"), Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing the Debtor to

enter into a debtor-in-possession financing facility with OEP Open Range Holdings, LLC (the

"Lender") and to obtain postpetition financing in the aggregate principal amount of $4 million on

a superpriority administrative claim basis, secured by first priority liens on unencumbered assets

and second priority liens on encumbered assets pursuant to the Interim Order and by first priority

priming liens on all assets pursuant to the Final Order, and with a release of certain claims

---

[1] The last four digits of the Debtor's federal tax identification number are 0894.

subject to an investigation by the Debtor; and (b) scheduling a final hearing (the "Final Hearing") to consider approval of the relief sought in the Motion on a final basis. The terms of the debtor-in-possession financing facility are set forth in the proposed Debtor-In-Possession Credit Agreement (the "Credit Agreement") attached hereto as Exhibit B. In support of this Motion, the Debtor relies upon and fully incorporates by reference the Declaration of Chris Edwards, Chief Financial Officer of Open Range Communications, Inc., in Support of the Debtor's Chapter 11 Petition and First Day Motions as supplemented by the Declaration of Chris Edwards, Chief Financial Officer of Open Range Communications, Inc., in Support of Motion of the Debtor for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001, 9014 and 9019 (I) Authorizing the Debtor to Obtain Postpetition Secured Financing, and (II) Scheduling a Final Hearing (together, the "Edwards Declaration").[2] In further support of the Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, supported by Bankruptcy Rules 2002, 4001, 9014 and 9019 and Local Rules 2002-1 and 4001-2.

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Edwards Declaration or the Credit Agreement, as applicable.

49524/0001-7957321v1

# BACKGROUND

## A. General Background

4. On October 6, 2011 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this bankruptcy case, is set forth in detail in the Edwards Declaration, filed concurrently herewith and fully incorporated herein by reference.

5. The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. No official committee of unsecured creditors has been appointed in this Chapter 11 case.

## B. The Debtor's Capital Structure

7. On or about January 9, 2009, the Debtor entered into a Loan and Security Agreement (the "RUS Loan Agreement") with the United States of America, acting through the Rural Utility Service (the "RUS"), for loans in the aggregate amount of $267 million, to be used over a five year period for specified capital expenditures to build the Debtor's broadband network. The Debtor pledged, assigned and transferred to the RUS a continuing security interest in and to all of the Debtor's property as part of the RUS Loan Agreement. Pursuant to the RUS Loan Agreement, the Debtor also established a deposit account pledged to the RUS that holds the proceeds from the RUS loan (the "Deposit Account") to fund advances on pre-approved contracts. On or about April 29, 2011, the Debtor and the United States of America entered into an amendment to the RUS Loan Agreement (the "RUS Amendment"), which provided for a reduced loan commitment of $180 million. As of the Petition Date, there is approximately $4.9

million in the Deposit Account and the secured debt owed to the RUS is approximately $74 million.

8.      The Debtor's estimated unsecured liabilities as of the Petition Date are $36 million, including $15 million of amounts that the Debtor believes would be eligible for reimbursement by the RUS.

9.      In connection with the RUS Loan Agreement, the Debtor received an equity commitment from One Equity Partners III, L.P. ("OEP") in the amount of $100 million, which was funded in total on the closing of the transaction. On April 29, 2011, in conjunction with the RUS Amendment, OEP agreed to contribute $40 million pursuant to and subject to the conditions of an equity commitment (the "OEP April Commitment"), with an initial funding of $10 million. As of the Petition Date, OEP (directly or through an affiliate) had contributed $23.4 million of the $40 million under the OEP April Commitment. In addition, on October 5, 2011, to facilitate the Debtor's entry into chapter 11, OEP (directly or through an affiliate) provided funding in the amount of $1 million to the Debtor, reserving all rights as to the characterization of the funding as debt or equity. OEP also has outstanding management fees of $2,787,810, payment of which is contingent upon repayment in full of the RUS loan.

10.     The Debtor is authorized to issue 155,000,000 shares of common stock, $0.001 par value and 67,114,177 shares of preferred stock, $0.001 par value. The Debtor has issued 2,367,423 shares of common stock held by insiders as well as third parties. The Debtor also has issued 43,518,937 shares of preferred stock held by insiders as well as third parties. OEP (through an affiliate) holds 97% of Series B Preferred Stock and 99.6% of the Series C Preferred Stock. There is no public market for the equity securities of the Debtor.

## PRELIMINARY STATEMENT

11.     As the Debtor undertook the process of preparing to file this Chapter 11 case, it became clear that it lacked the liquidity to maintain its operations and preserve its assets during the pendency of such case. It was also apparent, given the encumbered status of substantially all of its assets and its forecasted cash receipts and disbursements, that its access to traditional sources of financing for chapter 11 debtors would be unavailable. Without access to adequate postpetition financing, it was clear that the Debtor would be unable to continue to meet its obligations as they came due and would be unable to operate in Chapter 11, all to the detriment of the Debtor's customers and other stakeholders. With no known other financing options available to it, the Debtor turned to OEP, its equity sponsor, to request financial support. The proposed Lender is the affiliate of OEP that holds a majority of the capital stock of OEP.

12.     Arm's length negotiations ensued with the Lender. Recognizing that the Debtor would be forced to file for liquidation under Chapter 7 in the absence of funding, leaving tens of thousands of rural customers without service and no opportunity to maintain service while transitioning to a new provider, and destroying the value of the assets that secure the RUS loan, the Lender ultimately agreed to provide financial support to the Debtor in the form of a $4 million secured postpetition loan (the "DIP Loan"), on the terms and conditions set forth in the Credit Agreement.

13.     The Lender's willingness to extend the DIP Loan to the Debtor was conditioned upon, among other things, (a) the grant of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code, (b) the grant of first priority priming liens on all assets (including those subject to the liens of the RUS) pursuant to section 364(d) of the Bankruptcy Code, and (c) the release of any and all claims held by or on behalf of the Debtor against the Lender and its affiliates and representatives relating to any acts or omissions arising during the

5

six-month period preceding the Petition Date, subject to an investigation by the Debtor and the passage of a customary challenge period. As to the requested grant of first priority priming liens, the Debtor requested, and the Lender agreed, that the grant be deferred to the Final Order, and that the Interim Order provide for an interim grant of first priority liens on unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code and second priority or other junior liens on encumbered assets pursuant to section 364(c)(3) of the Bankruptcy Code. The Debtor believed that the Lender's three conditions, with the agreed deferral on priming, were reasonable under the circumstances and, thus, decided that it was prudent to move forward with the Lender.

## RELIEF REQUESTED

14.     By this Motion, the Debtor requests that this Court (a) approve the Debtor's entry into the Credit Agreement and authorize it to borrow up to $4 million, (b) afford the Lender (i) on an interim basis pursuant to the Interim Order, the protections of sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and (ii) on a final basis pursuant to the Final Order[3] (which will be entered only after the Final Hearing to be scheduled and held following notice to parties in interest of the Motion and the Interim Order), the protections of sections 364(c)(1), 364(c)(2) and 364(d) of the Bankruptcy Code, (c) grant the Lender a release of claims on the terms set forth in the Credit Agreement, subject to an investigation by the Debtor and the passage of a customary challenge period, (d) modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the Credit Agreement, (e) confirm the Lender's good faith in furnishing the DIP Loan and the attendant applicability of section 364(e) of the Bankruptcy Code, (f) schedule the Final Hearing on the Motion to be held within thirty (30) days after the

---

[3]     A copy of the proposed Final Order will be filed under separate cover prior to the Final Hearing.

49524/0001-7957321v1

Petition Date to consider entry of the Final Order, which would, if entered as proposed, grant all of the relief requested in the Motion on a final basis, including the granting to the Lender of first priority priming liens, (g) waive any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and provide for immediate effectiveness of the DIP Orders, and (h) grant related relief. The Debtor submits that obtaining the relief here requested is in the best interest of the Debtor, its estate and creditors and presents the best opportunity for the Debtor to maximize the value of its assets for the benefit of all stakeholders.

## TERMS AND CONDITIONS OF POSTPETITION EXTENSION OF CREDIT

15.    The following table sets forth the most notable provisions of the Credit Agreement and the Interim Order, including those that are expressly required to be identified in accordance with Rule 4001(c)(i)(B)[4] and Local Rule 4001-2(a)(i)[5]:

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Borrower | Open Range Communications, Inc. | Credit Agreement: Preamble<br><br>Interim Order: Introductory paragraph (a) |
| N/A | Lender | OEP Open Range Holdings, LLC | Credit Agreement: Preamble<br><br>Interim Order: Introductory |

---

[4]    Certain provisions referenced in Bankruptcy Rule 4001 are not applicable here: (i) waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, Bankruptcy Rule 4001(c)(i)(B)(v); (ii) the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation or entry of a confirmation order, Rule 4001(c)(i)(B)(vi); and (iii) prepayment premiums, Rule 4001(c)(i)(B)(xii).

[5]    Certain provisions referenced in Local Rule 4001-2 are not applicable here: (i) grant of cross-collateralization protection, Local Rule 4001-2(a)(i)(A); and (ii) "roll-up" provisions, Local Rule 4001-2(a)(i)(E).

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | | paragraph (a) |
| Bankruptcy Rule 4001 (c)(i)(B) | Size of postpetition facility | Maximum availability of $4 million subject to the Budget.[6] The Lender has agreed to make the DIP Loans to the Borrower on a weekly basis pursuant to the Budget, each in an amount not to exceed budgeted costs and expenses for the week with respect to which each DIP Loan is requested. | Credit Agreement: §§ 2.1, 2.2 Interim Order: Introductory paragraph (a), ¶ 3 |
| N/A | Use of proceeds | The proceeds of the DIP Loans will be used for working capital and other of the Debtor's ordinary course corporate needs (which will include payment of the reasonable fees and disbursements of counsel and any financial consultant, advisor or expert), in each case subject to the terms of the Credit Agreement, the Interim Order, and the Budget. | Credit Agreement: § 8.1.6 Interim Order: ¶ 3 |
| Bankruptcy Rule 4001 (c)(i)(B) | Interest rate | Interest on the outstanding principal amount of the DIP Loans will be paid for each Interest Period therefor, commencing on the related Advance Date until such DIP Loan is paid in full, at a rate per annum equal to 4.60% for such DIP Loan for such Interest Period. Each Interest Period shall have a duration of thirty (30) days. All interest shall be computed and deemed to accrue using a compound interest method on the basis of the actual number of days in the period for which such interest or fee is payable over a year comprised of 360 days. | Credit Agreement: §§ 3.1-3.3 |
| Bankruptcy Rule 4001 (c)(i)(B) | Term/ Maturity date | The DIP Loan matures on October 6, 2012 and must be paid in full (including all accrued and previously capitalized interest) on the Termination Date, which is the earliest of (i) the 363 Sale Closing Date, (ii) the effective date of a plan of reorganization, (iii) the date on which the Commitment is terminated pursuant to an Event of Default, and (iv) the Maturity Date (October 12, 2012). | Credit Agreement: § 4.1 Interim Order: ¶ 15 |
| N/A | Fees | The Lender has agreed to forego any fee on the Commitment Amount and, thus, no fees are owed by the Debtor with respect to the Credit Agreement. The Lender has also agreed to bear its own fees and expenses. | Credit Agreement: § 3.4 |

---

[6] A copy of the Budget is attached as <u>Exhibit 1</u> to the Interim Order.

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Payments/Prepayments | The Debtor promises to repay all Obligations under the Credit Agreement on the Termination Date.<br><br>The Debtor may at any time and from time to time prepay the DIP Loans, in whole or in part, without premium or penalty.<br><br>If the Debtor receives (i) any proceeds of any 363 Sale (net of reasonable expenses incurred by the Borrower in connection with such 363 Sale), (ii) any insurance or condemnation proceeds (unless the Debtor promptly informs the Lender that such proceeds are to be used to repair or replace damaged property and are in fact so used within sixty (60) days of receipt), and (iii) other extraordinary receipts (other than tax refunds the receipt of which is anticipated in the Budget), the Debtor shall, on the Business Day after such receipt, apply such proceeds or receipts to prepay the Obligations; and shall provide the Lender with written notice thereof.<br><br>The Lender may, at any time and from time to time, in its sole discretion, elect to convert, by providing written notice to the Debtor, the DIP Loans or any portion thereof into a capital contribution in exchange for capital stock of the Debtor. | Credit Agreement: §§ 4.1-4.4<br><br>Interim Order: ¶ 16 |
| Bankruptcy Rule 4001 (c)(i)(B)(i);<br><br>Bankruptcy Rule 4001 (c)(i)(B)(ii);<br><br>Bankruptcy Rule 4001 (c)(i)(B)(xi);<br><br>Local Rule 4001-2(a)(i)(D)[7]; | Priority and Security | Upon entry of the Interim Order, the Lender will be granted:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims having priority over any and all administrative expenses of the kind specified in or arising or ordered under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out.<br><br>(b) subject to the Carve-Out, the following liens:<br><br>(i) pursuant to section 364(c)(2) of the Bankruptcy | Credit Agreement: §§ 11.4, 11.5<br><br>Interim Order: ¶¶ D, 4 |

---

[7] The Debtor has cited to this Local Rule out of an abundance of caution but would note that such Local Rule is seemingly inapplicable. The Debtor believes that the Local Rule seeks to address provisions that "immediately" grant to a prepetition secured creditor liens on avoidance actions. Here, not only is the Lender not a prepetition secured creditor, but also the lien on avoidance actions would only be granted upon entry of the Final Order.

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| Local Rule 4001-2(a)(i)(G)[8] | | Code, first priority perfected Liens on and security interests in any of the DIP Collateral that is not subject to a Lien or security interest on the Petition Date (excluding, however, avoidance actions under chapter 5 of the Bankruptcy Code); and<br><br>(ii) pursuant to section 364(c)(3) of the Bankruptcy Code, second or other junior priority perfected Liens on and security interests in any of the DIP Collateral that is subject to a Lien or security interest on the Petition Date (excluding, however, avoidance actions under chapter 5 of the Bankruptcy Code).<br><br>For the avoidance of doubt, pending the entry of the Final Order, the DIP Liens and security interests granted to the Lender shall not prime, and shall be junior to, the Liens and security interests that secure any prepetition claim against the Debtor that is secured by valid, enforceable and unavoidable Liens against the assets and properties of the Debtor.<br><br>Upon entry of the Final Order, the Lender will be granted:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims having priority over any and all administrative expenses of the kind specified in section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out.<br><br>(b) subject to the Carve-Out, the following liens:<br><br>(i) pursuant to Section 364(c)(2) and 364(d) of the Bankruptcy Code, first priority perfected Liens on and security interests in all of the DIP Collateral (including avoidance actions under chapter 5 of the Bankruptcy Code), priming the Liens and security interests of the holders of any Prior Secured Claims, including the RUS.<br><br>The DIP Collateral consists of: all right, title and interest in and to all of the assets and properties | |

(Footnote Cont'd From Previous Page)

[8]    The justification for the inclusion of the provisions relating to priming of the RUS secured claim is contained at Paragraphs 23-28 of this Motion.

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | (tangible, intangible, real, personal or mixed) of the Borrower, wherever located, whether now or hereafter existing, owned, licensed, leased, consigned, arising or acquired, including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, including avoidance actions under chapter 5 of the Bankruptcy Code (subject to entry of the Final Order), other general intangibles, and all products and proceeds of all of the foregoing. | |
| Local Rule 4001-2(a)(i)(F)[9] | Carve-out and, in particular, provisions that provide disparate treatment for professionals retained by a creditors' committee from those professionals retained by the debtor with respect to same. | The Interim Order provides for a "Carve-Out" of specified amounts from the aforementioned superpriority claims and liens granted to the Lender. Specifically, the Interim Order defines "Carve-Out" as (i) all fees required to be paid to the U.S. Trustee and to the Clerk of the Bankruptcy Court pursuant to section 1930(a) of title 28 of the United States Code; *plus* (ii) the unpaid fees and expenses of retained professionals of the Debtor employed pursuant to sections 327, 328, and 363 of the Bankruptcy Code (including approved ordinary course professionals) that are incurred prior to the Carve-Out Trigger Date (as defined herein) (and including amounts incurred but not invoiced or approved prior to the Carve-Out Trigger Date) (but only to the extent that such fees and expenses are payable under sections 330 and 331 of the Bankruptcy Code and pursuant to an order of the Court), but not exceeding the amounts therefore contained in the Budget, *plus* (iii) without duplication of the amounts described in clause (ii) above, the fees and expenses of such retained professionals to the Debtor, in the aggregate amount not to exceed $[          ][10], to be incurred after the Carve-Out | Credit Agreement: §§ 11.4, 11.5

Interim Order: ¶ 6 |

---

[9]     Notably, in <u>In re Ames Dep't Stores</u>, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. <u>Id.</u> at 40. The Debtor submits that the terms of the Carve-Out (including the disparity that exists between the amount recoverable by professionals of the Debtor on the one hand and any statutory committee on the other) are reasonable under the circumstances.

[10]     The amount associated with this aspect of the Carve-Out is expected to be agreed to by the Debtor and the Lender prior to the interim hearing on the Motion.

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | Trigger Date (but only to the extent that such fees and expenses are payable under sections 330 and 331 of the Bankruptcy Code and pursuant to an order of the Court); *plus* (iv) fees and expenses of the Debtor's claims and noticing agent not to exceed $10,000; *plus* (v) unpaid fees and expenses of committee members and of any retained professionals of any statutory committee appointed in the Case (a "Statutory Committee") that are incurred prior to the Carve-Out Trigger Date and invoiced and payable under sections 330 and 331 of the Bankruptcy Code (but only to the extent that such fees and expenses and committee member expenses are payable pursuant to an order of the Court) but not exceeding the amounts therefor contained in the Budget; *provided*, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described herein.<br><br>As used in the Interim Order, "Carve-Out Trigger Date" means the date on which the Lender provides written notice to the Debtor and counsel to the Debtor, with a copy of such notice to counsel for any Statutory Committee (if appointed), that the Carve-Out is invoked, which notice shall be delivered only on or after and during the continuation of an Event of Default. | |
| Bankruptcy Rule 4001 (c)(i)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C)[11] | 506(c) waiver | Subject to the entry of the Final Order, other than the Carve-Out, the Debtor, for itself and its estate, shall not assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Lender upon the DIP Collateral. | Credit Agreement: §§ 8.2.5(d), 9.1.8(e)<br><br>Interim Order: ¶ 7 |
| Bankruptcy Rule 4001 (c)(i)(B)(viii)<br><br>Bankruptcy Rule 4001 (c)(i)(B)(iii) | Release, waiver, or limitation on claims or other causes of action belonging to | As of the Closing Date, but subject to any timely and successful Challenge (defined below), the Borrower and any Person seeking to exercise the rights of the Borrower's estate, including, without limitation, any successor to the Borrower or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, forever releases and waives all | Credit Agreement: § 10.1<br><br>Interim Order: ¶ 12 |

---

[11] The Debtor has cited to this Local Rule out of an abundance of caution but would note that such Local Rule is seemingly inapplicable. The Debtor believes that the Local Rule seeks to address waivers of 506(c) rights as to prepetition secured claims and does not apply in the context of postpetition borrowings from a new money lender.

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| Local Rule 4001-2(a)(i)(B)[12] | the estate or the trustee; | claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, willful misconduct, or gross negligence) in connection with or related to the Borrower, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place during the six (6)-month period preceding the Petition Date, that may be asserted against (i) the Lender, (ii) the Lender's Affiliates, (iii) any of the Lender's or the Lender's Affiliates' respective former, current or future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, counsel, advisors, Affiliates, members, managers, general or limited partners or assignees, but only in their capacities as such or (iv) any of the foregoing parties' respective former, current or future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, counsel, advisors, Affiliates, members, managers, general or limited partners or assignees, but only in their capacities as such (the "Release").

The Release shall be binding upon the Debtor in all circumstances and upon all other parties in interest in the Case, including, without limitation, any Statutory Committee, unless and to the extent (a) the Debtor has timely filed an adversary proceeding or contested matter by no later than the date that is sixty (60) days after the Petition Date, asserting a claim against the Lender (a "Challenge"), and (b) there is a final order in favor of the Debtor sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. If an Event of Default shall occur during the sixty (60) days after the Petition Date, before the completion of an investigation by the Debtor, the investigation shall end unless the Lender | |

(Footnote Cont'd From Previous Page)

[12]     The justification for the inclusion of the provision relating to the Release is contained at Paragraphs 29-30 of this Motion.

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | agrees to continue funding the DIP Loan. | |
| Bankruptcy Rule 4001(c)(i)(B)(ix) | The indemnifica-tion of any entity. | The Debtor has agreed to indemnify the Lender and its officers, directors, shareholders, members, managers, controlling persons, and employees (each of the foregoing Persons being individually called an "Indemnified Party"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively called "Indemnified Amounts") awarded against or incurred by any of them arising out of or relating to the failure of the Borrower, its agents or representatives to perform its respective obligations under any Transaction Document or arising out of claims asserted against an Indemnified Party relating to the transactions contemplated hereby or thereby or the use of proceeds therefrom, including, without limitation, in respect of the funding of any DIP Loan, excluding, however, Indemnified Amounts to the extent determined by a court of competent jurisdiction to have resulted from gross negligence or willful misconduct on the part of such Indemnified Party. | Credit Agreement: § 10.2 Interim Order: ¶ 13 |
| Bankruptcy Rule 4001 (c)(i)(B)(iv) | Waiver or modification of the automatic stay | The automatic stay is deemed lifted and modified to permit the Lender to exercise any and all of its rights and remedies under the Credit Agreement, the other Transaction Documents and this Order. More specifically, upon the occurrence and during the continuance of an Event of Default, section 362 of the Bankruptcy Code is deemed modified and vacated to the extent necessary to permit the Lender to: (i) terminate the DIP Loan and thereafter cease to make DIP Loans to the Debtor; (ii) declare the principal of and accrued interest and other liabilities constituting the DIP Obligations to be due and payable; (iii) enforce rights against any other DIP Collateral in the possession of the Lender; and/or (iv) take any other action or exercise any other right or remedy permitted to the Lender under the Transaction Documents, the Order or by operation of law; provided, however, the Lender is required to comply with certain notice procedures set forth in the Interim Order. | Interim Order: ¶ 9 |
| Bankruptcy Rule 4001 (c)(i)(B)(vii) | Waiver or modification of applicability of non- | The DIP Liens granted pursuant to the Interim Order are deemed to constitute valid, enforceable, unavoidable and duly perfected security interests and liens, and the Lender is not required to file or serve financing statements, notices of lien or similar | Credit Agreement: § 7.7 Interim Order: |

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the DIP Liens does not affect the validity, enforceability, unavoidability, perfection or priority of the DIP Liens. | ¶ 5 |
| N/A | Representations and Warranties | The Credit Agreement contains usual representations and warranties, including, but not limited to, organization and good standing; power and authorization to execute the Transaction Documents; no violation of the Debtor's organizational documents and material agreements; validity an binding nature of the Credit Agreement and the other Transaction Documents; government approvals; margin regulations; quality of title; accuracy of information; filing of taxes; and compliance with applicable laws. | Credit Agreement: §§ 7.1-7.12 |
| N/A | Affirmative Covenants | The Credit Agreement contains usual affirmative covenants, including but not limited to, compliance with laws; preservation of existence; access to information; keeping of records and books of account; reporting requirements of the Debtor including the delivery of monthly reports; disclosure of litigation relating to the Debtor; notice of material events; notification of Events of Default; furnishing of bankruptcy information; and use of proceeds. | Credit Agreement: § 8.1 |
| N/A | Negative Covenants | The Credit Agreement contains usual negative covenants, including but not limited to, limitations on: sales and liens; mergers, acquisitions; and certain types of payments (such as dividends). As to bankruptcy matters, the negative covenants prohibit the Debtor from seeking or consenting to, without the prior written consent of the Lender, (i) any modification, stay, vacation or amendment to the DIP Orders; (ii) a claim of any third party against the Debtor having a priority equal or superior to the Superpriority Claim of the Lender in respect of the Obligations, except for the Carve-Out; (iii) any Lien on any DIP Collateral having a priority equal or superior to the priority of the Liens of the Lender; (iv) any surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code; (v) any order seeking authority to take any action prior to the effectiveness of a plan of | Credit Agreement: § 8.2 |

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | reorganization that is prohibited by the Credit Agreement or refrain from taking any action that is required to be taken by the Credit Agreement; or (vi) any plan of reorganization unless all of the Obligations are to be paid in full in cash or other immediately available funds and the arrangements provided for herein terminated pursuant thereto. | |
| N/A | Events of Default | The Credit Agreement contains usual Events of Default including nonpayment of amounts due; breach of representations and warranties; the filing of tax liens in excess of $500,000; certain regulatory changes; the occurrence of existence of circumstances which has had or is reasonably likely to have a Material Adverse Effect; and the occurrence of certain events in the Debtor's chapter 11 case, including (i) with respect to the Final Order, if (a) the proposed grant of first priority priming liens and the Release is not approved by the Bankruptcy Court, or (b) the Final Order is not entered within thirty (30) days after the Petition Date, or (ii) the Release is subject to a Challenge. | Credit Agreement: § 9.1 |
| N/A | Termination and Remedies | Upon the occurrence of any Event of Default, the Lender may, by notice to Debtor, declare all or any portion of the outstanding principal amount of the DIP Loans and other related Obligations to be due and payable and/or declare the Commitment (if not theretofore terminated) to be terminated, whereupon the full unpaid amount of such DIP Loans and other related Obligations shall be so declared immediately due and payable and the Commitment shall terminate.\n\nIf an Event of Default shall occur, upon three (3) Business Days' prior written notice to the Borrower and any statutory committee appointed in the Case, the Lender may exercise, in addition to all other rights and remedies granted to them in the Credit Agreement and in any other instrument or agreement securing, evidencing or relating to the DIP Obligations, all rights and remedies of a secured party under the UCC or any other applicable law. | Credit Agreement: § 9.2 |
| N/A | Conditions Precedent to Loans | The Lender's obligation to make the DIP Loans is subject to various conditions including receipt of certain information from the Debtor and evidence that (a) the Interim Order has been entered by the Bankruptcy Court, is in full force and effect, and has not been stayed, reversed, vacated or otherwise modified and (b) except as consent to by the Lender, no | Credit Agreement: §§ 6.1, 6.2 |

49524/0001-7957321v1

| Bankruptcy Rule / Local Rule | Term | Summary | Provision in Relevant Document(s) |
|---|---|---|---|
| | | application or motion for stay, reversal vacation or modification of the Order is pending. | |

## APPLICABLE AUTHORITY AND BASIS FOR RELIEF

### A.     The Credit Agreement Should be Approved

16.     As described above, it is essential that the Debtor immediately obtain access to financing in order to continue operating its business in the ordinary course and preserve estate assets. The Debtor has proposed to obtain financing under the Credit Agreement by providing the Lender with protections pursuant to sections 364(c) and (d) of the Bankruptcy Code. More specifically, the Debtor is proposing that the Court, through entry of the Interim Order, afford the Lender (a) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims having priority over any and all administrative expenses of the kind specified in section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out; (b) pursuant to section 364(c)(2) of the Bankruptcy Code, and subject to the Carve-Out, a perfected first priority Lien on, and security interest in the DIP Collateral not otherwise subject to a valid and perfected Lien or security interest on the Petition Date (excluding, however, avoidance actions under Chapter 5 of the Bankruptcy Code); and (c) pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to the Carve-Out, a perfected junior lien on, and security interest in the DIP Collateral that is otherwise subject to a valid and perfected lien or security interest on the Petition Date (excluding, however, avoidance actions under chapter 5 of the Bankruptcy Code). The Debtor is further proposing that the Court, through entry of the Final Order afford the Lender (a) pursuant to section 364(c)(1) of the

17

Bankruptcy Code, superpriority claims having priority over any and all administrative expenses of the kind specified in section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code; (b) pursuant to section 364(c)(2) of the Bankruptcy Code, and subject to the Carve-Out, a perfected first priority Lien on, and security interest in the Debtor's collateral not otherwise subject to a valid and perfected Lien or security interest on the Petition Date (including avoidance actions under Chapter 5 of the Bankruptcy Code); and (c) pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority priming lien on, and security interest in the Debtor's collateral that is otherwise subject to a valid and perfected lien or security interest on the Petition Date.

1. **Approval of Postpetition Financing Under Section 364(c) of the Bankruptcy Code**

17.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured administrative basis, then pursuant to section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. Specifically, the statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c). See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code);

18

_In re Crouse Group, Inc._, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

18.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under Section 364(b), _i.e._, by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

_In re Ames Dep't Stores_, 115 B.R. at 37-39; _see also_ _In re St. Mary Hospital_, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); _In re Crouse Group, Inc._, 71 B.R. at 549.

19.     Each of these elements are here satisfied. Specifically, the Debtor has determined (in consultation with its advisors) that its current capital structure and business condition, as described in the Edwards Declaration, renders it unable to obtain adequate postpetition financing on an unsecured administrative basis.

20.     The Debtor has also satisfied the second prong of the aforementioned test, which looks to whether the credit transaction is necessary to preserve the assets of the estate. Here, in the absence of the financing, the Debtor would be unable to meet its ordinary course operational obligations, forcing the Debtor into an immediate liquidation. This would not only detrimentally impact the value of the Debtor's assets but would result in the termination of customer services without an adequate opportunity to transition to alternative service providers.

21.     Finally, the Debtor submits that the proposed terms of the Credit Agreement are fair, reasonable and adequate given today's market and the facts of this case. It is, for example,

19

noteworthy that the DIP Loan carries a below market interest rate and the Credit Agreement does not require the Debtor to pay the Lender any financing fees or any other fees, costs or expenses incurred by it in the process. The Debtor carefully evaluated the proposed financing structure from the Lender, engaged in negotiations with the Lender regarding the Credit Agreement, and prior to commencing this case, determined that the Lender's proposal was best suited to the Debtor's needs given the circumstances. Moreover, the terms and conditions of the Credit Agreement were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while preserving and maximizing the value of the Debtor's estate pending a sale or a wind down more favorable than could be achieved through immediate liquidation.

22.     In light of the Debtor's satisfaction of the aforementioned three-part test, the Debtor respectfully requests that this Court afford the Lender the protections of section 364(c) of the Bankruptcy Code (both with respect to the Interim Order and, as to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code, with respect to the Final Order).

### 2.     Approval of Priming Liens and Adequate Protection Under Section 364(d)

23.     As noted above, the Lender was unwilling to furnish the DIP Loans to the Debtor unless the Credit Agreement provided that, upon the entry of the Final Order, the Lender would be afforded the protections of section 364(d) of the Bankruptcy Code. Thus, although the Debtor is able to obtain initial postpetition funding from the Lender solely by furnishing it with the protections of section 364(c) of the Bankruptcy Code pursuant to the Interim Order, the Lender is unwilling to provide further funding unless the Final Order affords it the additional protections of section 364(d) of the Bankruptcy Code.

49524/0001-7957321v1

24.     If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming" lien. 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(a)     the trustee is unable to obtain such credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

25.     The Debtor has concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the Lender under the Credit Agreement is currently unobtainable.  Substantially all of the Debtor's assets are subject to the prepetition liens of the RUS.  And because of the amount of the RUS secured Claim, obtaining the financing needed by the Debtor as unsecured debt or debt which would be secured by liens junior to the liens of the holders of the RUS secured claim was not a realistic option, especially given the current state of the capital markets.  Notably, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Thus, "[t]he statute imposes no duty  to seek credit from every possible lender before concluding that such credit is unavailable." In re Snowshoe Co., 789 F.2d at 1088.  Here, the Debtor's financial and operational condition, coupled with

21

encumbered assets valued at less than the claims against them, rendered it unlikely that any institution other than the Lender would be willing to lend. Moreover, if any other institution was interested in lending, it could not be expected to do so without conditioning its lending on priming liens, which could not be obtained without significant litigation. The Debtor could not sustain itself without funding pending the entry of a priming order. For that reason, the Debtor considered the Lender to be the only party likely to provide immediate funding.

26.     The Debtor is, of course, cognizant of the fact that the protections afforded to a lender under section 364(d) of the Bankruptcy Code require a debtor to provide the holder of the lien that is proposed to be primed with "adequate protection" of its interest. 11 U.S.C. § 364(d)(1)(B). The determination of adequate protection, however, is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

27.     Here, the Debtor is willing to stipulate to the fact that the RUS is undersecured. There is, thus, no equity cushion that exists to afford the RUS the protection of its prepetition liens. But if the Debtor is unable to obtain the further DIP Loans, the only option for the Debtor will be conversion of this case to a case under Chapter 7 of the Bankruptcy Code, which would clearly negatively impact the collateral that secures such liens. In contrast, the access to the chapter 11 process that will be gained through the DIP Loans will serve to preserve the value of that collateral while the Debtor pursues a sale or engages in a reasonable wind down. In this way, the financing proposed under the Credit Agreement provides the Debtor with the liquidity

22

needed to maximize the value of its estate and avoid the forced liquidation of its assets (substantially all of which are subject to the prepetition liens of the RUS) at distressed values.

28.     Accordingly, the Debtor has satisfied the respective requirements of sections 364(c) and (d) of the Bankruptcy Code and the approval sought with respect to those aspects of the Interim Order and the Final Order, respectively, which seek to afford the Lender the protections of these provisions should be approved.

**B.     The Release Should be Approved**

29.     In consideration of the DIP Loan, the Credit Agreement provides the Lender with the Release of all claims held by or on behalf of the Debtor that may have arisen during the six-month period preceding the Petition Date. A release is not uncommon in the context of postpetition financing, provided that there is an opportunity for investigation and challenge. While in most postpetition financing agreements a debtor is required to represent that it holds no claims against its lenders, leaving the investigation and challenge to a statutory committee, here, the Debtor is taking no position as to whether or not any claims exist but instead will undertake a sixty-day investigation to determine whether there are any viable claims against the Lender. The Release will be effective only if there is no timely and successful Challenge.

30.     The Release under the Credit Agreement is a reasonable component of the consideration for the DIP Loan. Moreover, in view of the opportunity for investigation and Challenge, the Release may be approved as a compromise and settlement under Bankruptcy Rule 9019. In addition, to the extent the Release constitutes a disposition of property of the estate outside the ordinary course of business, it is authorized by and should be approved under section 363(b) of the Bankruptcy Code.

49524/0001-7957321v1

## C.    The Automatic Stay Should be Modified

31.    The DIP Orders contemplate a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders and the Credit Agreement.  Provisions of this kind are standard in debtor-in-possession financings and are reasonable under the circumstances.

## D.    The Lender Should be Protected by Section 364(e)

32.    Section 364(e) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e).  The terms and conditions of the Credit Agreement were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the Lender should be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Loans.

## E.    Interim Approval Should Be Granted

33.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

24

34.     The Debtor requests that the Court hold and conduct an interim hearing to consider entry of the Interim Order authorizing the Debtor from and after entry of the Interim Order until the Final Hearing to receive the DIP Loan contemplated by the Credit Agreement. This relief will enable the Debtor to preserve and maximize the value of its assets and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

**F.    Notice Procedures and the Final Hearing**

35.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing, and a hearing to consider the Final Order is ordinarily not held until at least ten (10) days after the organizational meeting of the creditors' committee. The Debtor will, within three (3) business days of the entry of the Interim Order by the Court, serve by first-class mail, a copy of the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the Final Order on the date established by the Court in the manner proscribed by the Interim Order.

36.     The Debtor respectfully requests that the Court schedule the Final Hearing on this Motion no later than thirty (30) days after the Petition Date. Such relief is necessary in order to avoid a default under the Credit Agreement and to avoid immediate and irreparable harm and prejudice to the Debtor's estate.

**NOTICE**

37.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee, (b) the United States Department of Agriculture, (c) counsel to One Equity Partners, III, L.P. and the Lender, (d) the United States Securities and Exchange Commission, (e) the Internal Revenue Service, (f) the Office of the United States Attorney for the District of Delaware, (g) those entities or individuals listed on the Debtor's list of thirty largest unsecured creditors, and

(h) the Debtor's cash management banks. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems appropriate.

Dated: October 7, 2011
      Wilmington, Delaware

**COLE, SCHOTZ, MEISEL**
**FORMAN & LEONARD, P.A.**

By: _____

Norman L. Pernick (No. 2290)
Marion M. Quirk (No. 4136)
Sanjay Bhatnagar (No. 4829)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Proposed Counsel for the Debtor and
Debtor in Possession

26