## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| OPEN RANGE COMMUNICATIONS INC., | : Case No. 11-11-13188 (KJC) |
| | : |
| Debtor. | : |

## DECLARATION OF CHRIS EDWARDS, CHIEF FINANCIAL OFFICER OF OPEN RANGE COMMUNICATIONS INC., IN SUPPORT OF MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(A), 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E) AND FED. R. BANKR. P. 2002, 4001, 9014 AND 9019 (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING, AND (II) SCHEDULING A FINAL HEARING

I, Chris Edwards, hereby declare under penalty of perjury:

1.      I am Chief Financial Officer of Open Range Communications Inc. (the "Company," or the "Debtor"), a corporation organized under the laws of the State of Delaware In this capacity, I am familiar with the Debtor's day-to-day operations, businesses, financial affairs, and books and records.

2.      On October 6, 2011 (the "Petition Date"), the Debtor filed with the Court a voluntary petition (collectively, the "Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its businesses and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      I submit this declaration (the "Edwards Declaration")[1] in support of the Debtor's Motion for entry of interim and final orders authorizing the Debtor to enter into a debtor-in-

---

[1] Capitalized terms no otherwise defined herein shall have the meaning ascribed to them in the DIP Motion.

possession financing facility with OEP Open Range Holdings, LLC (the "DIP Motion"), filed contemporaneously herewith. I rely on and fully incorporate by reference my Declaration in Support of the Debtor's Chapter 11 Petition and First Day Motions (Docket No. 2).

4.    Except as otherwise indicated herein, all facts set forth in this Edwards Declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and advisors, or my opinion based on my experience, knowledge, and information concerning the Company's operations and financial condition. I am authorized to submit this Edwards Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

A.    **The Debtor's Capital Structure**

5.    On or about January 9, 2009, the Debtor entered into a Loan and Security Agreement (the "RUS Loan Agreement") with the United States of America, acting through the Rural Utility Service (the "RUS"), for loans in the aggregate amount of $267 million, to be used over a five year period for specified capital expenditures to build the Debtor's broadband network. The Debtor pledged, assigned and transferred to the RUS a continuing security interest in and to all of the Debtor's property as part of the RUS Loan Agreement. Pursuant to the RUS Loan Agreement, the Debtor also established a deposit account pledged to the RUS that holds the proceeds from the RUS loan (the "Deposit Account") to fund advances on pre-approved contracts. On or about April 29, 2011, the Company and the United States of America entered into an amendment to the RUS Loan Agreement (the "RUS Amendment"), which provided for a reduced loan commitment of $180 million. As of the Petition Date, there

2

is approximately $4.9 million in the Deposit Account and the secured debt owed to the RUS is approximately $74 million.

6.      The Debtor's estimated unsecured liabilities as of the Petition Date are $36 million, including $15 million of amounts that the Debtor believes would be eligible for reimbursement by the RUS.

7.      In connection with the RUS Loan Agreement, the Debtor received an equity commitment from One Equity Partners III, L.P. ("OEP") in the amount of $100 million, which was funded in total on the closing of the transaction. On April 29, 2011, OEP agreed to contribute $40 million pursuant to an equity commitment (the "OEP April Commitment"), with an initial funding of $10 million. As of the Petition Date, OEP (directly or through an affiliate) had contributed $23.4 million of the $40 million under the OEP April Commitment. In addition, on October 5, 2011, to facilitate the Debtor's entry into chapter 11, OEP (directly or through an affiliate) provided funding in the amount of $1 million to the Debtor, reserving all rights as to the characterization of the funding as debt or equity. OEP also has outstanding management fees of $2,787,810, payment of which is contingent upon repayment in full of the RUS loan.

8.      The Debtor is authorized to issue 155,000,000 shares of common stock, $0.001 par value and 67,114,177 shares of preferred stock, $0.001 par value. The Debtor has issued 2,367,423 shares of common stock held by insiders as well as third parties. The Debtor also has issued 43,518,937 shares of preferred stock held by insiders as well as third parties. OEP (through an affiliate) holds 97% of Series B Preferred Stock and 99.6% of the Series C Preferred Stock. There is no public market for the equity securities of the Debtor.

49249/0001-7952645v2

**B.     Need for DIP Financing and Negotiated Terms of Same**

9.      The Company has forecast a $6 million funding need to effect the purposes of this chapter 11 case (i.e., to utilize the benefits of the automatic stay and other Bankruptcy Code protections to effectuate either (i) a section 363 sale of substantially all of its assets as a going concern or sales for select assets (the "Sale") or (ii) a wind-down of its business operations through a liquidation in chapter 11).  I have been advised that the Company's access to traditional sources of financing for chapter 11 debtors would be unavailable because of, among other things, the encumbered status of substantially all of its assets.

10.     Without access to adequate postpetition financing, I believe that the Debtor would be unable to meet its ordinary course operational obligations, forcing the Debtor into immediate liquidation.  It is my belief that this would not only detrimentally impact the value of the Debtor's assets but would result in the termination of customer services without an adequate opportunity to transition to alternative service providers.  With no known other financing options available to it, the Debtor turned to OEP, its equity sponsor, to request financial support.

11.     Negotiations ensued with the Lender that involved the Debtor's advisors on the one hand and OEP's advisors on the other.  The Lender agreed to provide financial support to the Debtor in the form of a $4 million secured postpetition loan (the "DIP Loan"), on the terms and conditions set forth in the Credit Agreement and acknowledged that the Debtor would be forced to file for liquidation under chapter 7 in the absence of funding, leaving tens of thousands of rural customers without service and no opportunity to maintain service while transitioning to a new provider and destroying the value of the assets that secure the RUS loan.

4

12.    I believe that the proposed terms of the Credit Agreement are fair, reasonable and adequate given the facts of this case and conditions in today's market. I have been advised that the DIP Loan carries a below market interest rate and I understand that the Credit Agreement does not require the Debtor to pay the Lender any financing fees or any other fees, costs or expenses incurred by it in the process. The Debtor in consultation with its advisors carefully evaluated the proposed financing structure from the Lender, engaged in negotiations with the Lender regarding the Credit Agreement, and prior to commencing this case, determined that the Lender's proposal was best suited to the Debtor's needs given the circumstances. Moreover, I believe that the terms and conditions of the Credit Agreement were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while preserving and maximizing the value of the Debtor's estate pending a sale or a wind down more favorable than could be achieved through immediate liquidation.

## C.    Priming Liens and Adequate Protection

13.    The Debtor has concluded and I agree that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the Lender under the Credit Agreement is currently unobtainable. I understand that substantially all of the Debtor's assets are subject to the prepetition liens of the RUS. And because of the amount of the Prior Secured Claims, I have been advised that obtaining the financing needed by the Debtor as unsecured debt or debt which would be secured by liens junior to the liens of the holders of the Prior Secured Claims was not a realistic option, especially given the facts of this case and the current state of the capital markets.

14.    Here, the Debtor's financial and operational condition, coupled with encumbered

5

assets valued at less than the claims against them, rendered it unlikely that any institution other than the Lender would be willing to lend. Moreover, if any other institution was interested in lending, it could not be expected to do so without conditioning its lending on priming liens, which could not be obtained without significant litigation. The Debtor could not sustain itself without funding pending the entry of a priming order. For that reason, the Debtor considered the Lender to be the only party likely to provide immediate funding.

15.     Here, the Debtor is willing to stipulate to the fact that RUS is undersecured. There is, thus, no equity cushion that exists to afford RUS the protection of its prepetition liens. But if the Debtor is unable to obtain the further DIP Loans, I believe the only option for the Debtor will be conversion of this case to a case under chapter 7 of the Bankruptcy Code, which would clearly negatively impact the collateral that secures such liens. In contrast, the access to the chapter 11 process that will be gained through the DIP Loans will serve to preserve the value of that collateral while the Debtor pursues a sale or engages in a reasonable wind down. In this way, my view is that the financing proposed under the Credit Agreement provides the Debtor with the liquidity needed to maximize the value off its estate and avoid the forced liquidation of its assets (substantially all of which are subject to the prepetition liens of the RUS) at distressed values.

**D.     Releases**

16.     In consideration of the DIP Loan, the Credit Agreement provides the Lender with the Release of all claims held by or on behalf of the Debtor that may have arisen during the six-month period preceding the Petition Date. I have been informed that a release is not uncommon in the context of postpetition financing, provided that there is an opportunity for investigation and challenge. I understand that the Debtor is taking no position as to whether or not any claims

exist but instead will undertake a sixty-day investigation to determine whether there are any

viable claims against the Lender. In addition, it is my understanding that the Release will be

effective only if there is no timely and successful Challenge.

Accordingly, on behalf of the Debtor, I respectfully request that the DIP Motion be

approved.

49249/0001-7952645v2

17.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 7, 2011

_____
Chris Edwards
Chief Financial Officer
Open Range Communications Inc.

8