# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | (Chapter 11) |
| OPEN RANGE COMMUNICATIONS INC., | Case No. 11-13188 (KJC) |
| Debtor. | **Hearing Date: November 2, 2011 at 3:00 p.m. (ET)[1]**<br>**Objection Deadline for Bidding Procedures:**<br>**November 1, 2011 at 4:00 p.m. (ET)** |

## DEBTOR'S MOTION FOR ORDERS: (I)(A) APPROVING BIDDING AND AUCTION PROCEDURES IN CONNECTION WITH SALE OF ANY AND ALL OF THE DEBTOR'S ASSETS; (B) APPROVING PURCHASER PROTECTIONS, (C) SCHEDULING AN AUCTION AND EXPEDITED HEARING TO CONSIDER SALE OF ANY AND ALL DEBTOR'S ASSETS; AND (D) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (II)(A) AUTHORIZING AND APPROVING SALE OF ANY AND ALL DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (B) GRANTING RELATED RELIEF

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, hereby moves (the "Motion"), pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of order, attached hereto as <u>Exhibit A</u> (the "Bidding Procedures Order"): (I) (A) approving bidding and auction procedures (the "Bidding Procedures") in connection with the proposed sale of any and all of the Debtor's assets (the "Assets") free and clear of liens, claims, and interests; (B) approving purchaser protections, (C) scheduling an auction (the "Auction") and an expedited hearing (the "Sale Hearing") to consider the sale of the Assets (the "Sale"), and (D) approving the form and manner of notice thereof.

---

[1] This Hearing Date and Objection Deadline are subject to approval of the Court. By separate motion to shorten filed contemporaneously herewith, the Debtor has requested the Court to consider this Motion at the requested Hearing Date and approve the requested Objection Deadline.

The Debtor further requests that at the Sale Hearing, subject to the results of the Auction and Bidding Procedures set forth herein, this Court enter an order (the "Sale Order")[2] approving and authorizing and approving the Sale, free and clear of liens, claims, and interests. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and this Sale Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code. Such relief is also warranted under Bankruptcy Rules 2002, 6004 and 9014.

## BACKGROUND

3.     On October 6, 2011 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this bankruptcy case, is set forth in detail in the Declaration of Chris Edwards, Chief Financial Officer of Open Range Communications, Inc., In Support of Debtor's Chapter 11 Petition and First Day Motions (the "Edwards Declaration") [Docket No. 2].

4.     The Edwards Declaration states that the primary purpose of this chapter 11 case is to effectuate a section 363 sale of substantially all of the Debtor's assets as a going concern or sales for select assets. See Edwards Declaration ¶28. If a sale process is not successful within

---

[2]  The Debtor will file a copy of the form of Sale Order prior to Sale Hearing. The form of Sale Order will be available at no cost on the website maintained by the Debtor's noticing and claims agent at www.loganandco.com.

thirty (30) days of the Petition Date, the Debtor will immediately shut down its network and begin a wind-down of operations.  Id.

5.      On October 19, 2011, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

6.      The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No request for, or appointment of, a trustee or examiner has been made in this chapter 11 case.

**A.      The Debtor's Current Business Operations**

8.      Founded in 2004 and headquartered in Greenwood Village, Colorado, the Debtor is a broadband wireless internet provider whose primary focus is delivering high speed wireless internet and digital phone services to un-served and underserved communities across the United States.

9.      The Debtor has primarily deployed WiMAX technology on over 400 towers across its 4G network.  The Company's equipment (base stations and customer devices) are tuned to operate across any owned BRS spectrum and leased EBS spectrum.  As of the date herein, the Debtor provides wireless in-home data and VoIP (telephone) service to approximately 25,000 customers in approximately 159 markets across thirteen (13) states in the United States. These markets are primarily connected via microwave but a number of markets are connected by leased circuit backhaul.

10.      After recent reductions in force, the Debtor currently employs forty-seven (47) employees (the "Employees"), of whom thirty-three (33) are full time salaried Employees and fourteen (14) are hourly Employees.  All of the Debtor's full time salaried Employees are located

3

in Colorado, and the hourly Employees are field technicians located in Alabama, Arizona, California, Colorado, Georgia, Illinois, Indiana, New Jersey, Ohio, Pennsylvania and Wisconsin.

**B.    The Marketing and Sale Process**

11.    Since the Petition Date, the Debtor has been extremely focused under considerable time constraints on pursuing a sale, pursuant to section 363 of the Bankruptcy Code, of all its assets as a going concern or sales for select assets.  To that end, the Debtor retained FTI Consulting, Inc. ("FTI") to provide a Chief Restructuring Officer, Michael E. Katzenstein (the "CRO"), an Associate Chief Restructuring Officer, Chris LeWand (the "Associate CRO") and certain hourly temporary staff (as defined below) for post-petition crisis, turnaround, and related management services, including assisting the Debtor in marketing the Debtor's business.[3]

12.    FTI managed the sales due diligence process which was conducted on the business, operations, underlying assets and obligations of the Debtor.  FTI met with and conducted numerous teleconferences with management and other representatives of the Debtor. Furthermore, FTI also worked with the Debtor's management to build a comprehensive electronic data room containing detailed information regarding the Debtor's business.  In addition, FTI worked with the Debtor's management to prepare materials related to the sale process, including a teaser (the "Teaser") designed to create demand for the Sale, and a Confidential Sale Process Letter (the "Letter") which outlined the opportunity and requested prospective purchasers to submit their proposals by October 21, 2011 at 12 p.m. (MT).

13.    On or about October 10, 2011, FTI began sending the Teasers and Letters to fifty-eight (58) potential buyers, including strategic buyers as well as financial buyers with interest

---

[3] The Debtor filed a motion to retain FTI (the "FTI Motion") [Docket No. 74], which is scheduled to be heard by the Court on November 2, 2011.  The exact scope of services to be performed by FTI are set forth in the FTI Motion, and the engagement letter annexed thereto as Exhibit B.

and/or experience in the telecommunications industry or general interest in acquiring distressed assets. Of the fifty-eight (58) potential buyers contacted, twenty-two (22) negotiated and signed confidentiality agreements with the Debtor and were granted access to the online data room established by FTI. The data room included information concerning the Debtor's operations, assets, finances and obligations, and contained a "FAQ" section so potential purchasers could navigate the data room based on frequently asked questions. Potential purchasers who received access to the data room were encouraged to conduct extensive initial due diligence, and FTI and the Debtor's management held several conference calls and were accessible via e-mail to address specific questions and concerns. Furthermore, two potential purchasers, including the Proposed Purchaser (defined below), attended on-site management presentations to discuss the Debtor's business.

14. These efforts ultimately led to proposals from four (4) different potential purchasers proposing various terms and conditions for the purchase of the Debtor's assets, including two (2) proposals for substantially all of the Debtor's assets, and two (2) proposals for select assets or markets of the Debtor. After an extensive review of all the proposals, and in consultation with FTI, the Debtor, with the approval of the Debtor's Board of Directors, selected totheHome.com, LLC (the "Proposed Purchaser" or "Stalking Horse") to be the stalking horse for the Sale of the Assets as a going concern. The Debtor and its advisors actively negotiated with the Proposed Purchaser regarding the terms and conditions of a term sheet and facilitated various additional diligence requests made by the Proposed Purchaser. On October 27, 2011, the Debtor and the Purchaser executed a Proposed Stalking Horse Term Sheet (the "Term Sheet"). A copy of the Term Sheet is attached hereto as Exhibit B.

49524/0001-8009779v5

# **RELIEF REQUESTED**

15.     The Debtor seeks entry of two separate orders as follows:

(i)     The Bidding Procedures Order:  The Bidding Procedures Order, in substantially the form attached hereto as Exhibit A, approving: (a) the Bidding Procedures; (b) the notice (the "Notice of Auction and Expedited Sale Hearing") setting forth the dates, times, and location of the deadline to bid on the Assets, the auction of the Assets (the "Auction") and the expedited hearing to consider the Sale of the Assets (the "Sale Hearing"), pursuant to the schedule proposed in the Bidding Procedures Order, subject to the Court's availability; and (c) the Purchaser Protections (as defined below).

(ii)     The Sale Order:  Following the Auction (if any), an order (the "Sale Order"), approving the Sale of the Assets free and clear of Liens.  The Debtor will file a form of the Sale Order prior to the Sale Hearing.

## A.     **The Term Sheet**

16.     Given the Debtor's liquidity situation and imminent prospect of a shutdown of its network, the Debtor believes that an expedited Sale process will maximize value for all stakeholders.  Accordingly, the Term Sheet proposes the following timeline for the Sale of the Assets:[4]

| Event | Date |
|---|---|
| Execution of Asset Purchase Agreement | November 1, 2011 |
| Bid Procedures Hearing | November 2, 2011 |
| Submission Deadline for Qualified Bids (as defined below) | November 11, 2011 |
| Auction | November 14, 2011 |
| Sale Hearing | November 15, 2011 |
| Entry of Sale Order | November 17, 2011 |

---

[4]  The Debtor, in the exercise of its business judgment, reserves the right to change these sale-related dates in order to achieve the maximum value for the Assets.

49524/0001-8009779v5

17.     Furthermore, in addition to Sale approval milestone, the significant terms of the Term Sheet are as follows:[5]

(a)     Purchase Price: $2,000,000 in cash.

(b)     Acquired Permanent Assets: All or substantially all of the assets of Seller now owned or hereafter acquired used in or necessary for the conduct of Seller's business including, without limitation, (a) all equipment listed in the data room established by the Seller, including all computer hardware, software and networking equipment, all service vehicles, field tools and RF testing tools, and cabling, (b) the Seller's entire customer base, (c) the Seller's name (Open Range Communication Inc.) and branding assets and (d) all intellectual property, including patents, trademarks, and trade secrets (collectively, the "Acquired Permanent Assets"). These assets do not include assets set-out under Transition Period Assets or Excluded Surplus Assets.

(c)     Excluded Surplus Assets: All assets of Seller other than the Acquired Assets and Transition Period Assets ("Excluded Surplus Assets"). These assets will be retained by the Seller. This includes all warehoused WiMAX transmission and CPE equipment, radio equipment spares not currently deployed, excess personal computer equipment, and other surplus assets not required by the Buyer to continue operations. Excluded surplus assets includes any and all avoidance actions of the debtor, and any and all claims against third parties, including without limitation, Alvarion.

(d)     Transition Period Assets: All assets identified as being required for a transition period of up to nine months post Transaction Close. These assets will be retrieved and returned by the Purchaser to a location of the Seller's choice within nine months of Transaction Close if the Purchaser does not choose to purchase the assets under the First Right of Refusal. This will specifically include all WiMAX equipment that is currently deployed on over 400 towers around the network, current customer premise equipment and any other equipment specifically identified as required for only the transition period. Best attempts will be made to return this equipment in a timely fashion which preserves asset value.

(e)     First Right of Refusal: The Buyer will have the First Right of Refusal to purchase Transition Period Assets in the nine months subsequent to Transaction Close at a price of 10% of the historical undepreciated cost basis for these assets.

(f)     Operations Funding: From November 8, 2011 until execution of the Agreements contemplated in this term sheet, Buyer will pay to Seller $350,000 maximum per week (pro rated daily for partial weeks) for the continued operation of the Buyer's

_____

[5] The foregoing is only a brief summary. Capitalized terms not defined in this section shall have the meanings ascribed to them in the Term Sheet. In the event of any inconsistency between the above summary and the Term Sheet, the terms of the Term Sheet shall control.

customer serving operations.  This charge will not exceed $350,000 per week (averaged over the weeks between November 8, 2011 and closing, prorated for days elapsed) and amounts will be trued up to actual incremental charges incurred by the Seller for continued customer serving operations ("Operations Funding"). A $350,000 deposit is to be paid by the Buyer to the Seller within one day of Bankruptcy Court approval of the Bidding Procedures and Expense Reimbursement (the "Bidding Procedures Order").  This deposit will offset actual amounts incurred by the Buyer for Operations Funding.  Amounts in excess of the $350,000 deposit will be due upon execution of the Asset Purchase Agreement (estimated as of that date and trued up within 14 days thereafter).  In the event that Seller accepts a bid, other than that of Buyer, as the highest and best offer for the acquired permanent assets and consummates such transaction (an "Alternative Transaction"), all Operations Funding will be refunded to the Buyer.

(g)     Seller Assistance with Transition Planning:  From the date of the Bidding Procedures Order, the Seller will assist the Buyer with planning for the transition upon the closing of a sale to the Buyer (the "Closing").  This will include reasonable efforts (without requiring out of pocket expenditures by the Seller) to provide acceptable notifications (to the Buyer) to customers of the intent to continue services and thereby aid in preserving the customer base.  This will also include assistance planning for the assignment, rejection or renegotiation of commercial agreements between the Seller and vendors, to enable the Buyer to address vendor contracts as soon as practical upon the Closing, and other reasonable business planning and continuation efforts to assist with a efficient transition of the assets and operations.

(h)     Break-Up Fee and Expense Reimbursement:  In consideration of Buyer's entering into the Agreement and in recognition of Buyer's work in (i) establishing a bid standard or minimum for other bidders and (ii) for serving, by its name and expressed interest, as a catalyst for other bidders, as an reimbursement for Buyer's expenses incurred in connection with the Transaction, Seller shall pay to Buyer (A) a break-up fee in the amount of 4% of the Purchase Price (the "Break-Up Fee") and (B) an amount (in no event to exceed $170,000) equal to Buyer's actual reasonable and documented expenses incurred in connection with the Agreement and the transactions contemplated thereby (the "Expense Reimbursement"), if: (x) Seller accepts a bid, for the Acquired Permanent Assets, other than that of Buyer, as the highest and best offer and consummates such transaction (an "Alternative Transaction"), or (y) Buyer terminates the Agreement in the event of Seller's failure to perform in any material respect any obligation required to be performed by it under the Agreement.

The Break-Up Fee and Expense Reimbursement shall be paid as an administrative priority of Seller under section 503(b)(1) of the Bankruptcy Code upon the earlier to occur of the consummation of any Alternative Transaction, or the conversion of the Bankruptcy Case to a case under chapter 7 of the U.S. Bankruptcy Code or within two business days of Buyer's termination of the Agreement as described in clause (y) of the immediately preceding sentence.

8

18. **Provisions That May Implicate Local Rule 6004-1**. Local Rule 6004-1 requires, among other things, that certain provisions contained in sale motions and sale orders be highlighted. The Debtor believes that certain provisions of this Motion and/or Term Sheet may implicate Local Rule 6004-1 as follows:

    a.     **Copy of Proposed Purchase Agreement**: A copy of the Term Sheet is attached hereto as Exhibit B. The Term Sheet contemplates that an asset purchase agreement (the "Agreement") will be executed within five days of the date of the filing of this Motion.

    b.     **Proposed Sale Order**: A form of the proposed Sale Order will be filed prior to the Sale Hearing.

    c.     **Other Relevant Provisions**:

        i.     **Private Sale/No Competitive Bidding**: As discussed herein, the Debtor seeks to expose the Assets to competitive bidding through an Auction pursuant to the Bidding Procedures. If there is no higher and better offer at the Auction, the Debtor will support a sale to the Stalking Horse.

        ii.     **Closing and Other Deadlines**: The Sale must close within several days after entry of the Sale Order.

        iii.     **Good Faith Deposit**: None, but the Proposed Purchaser will pay to the Debtor a deposit of $350,000 for Operations Funding (as defined and described above).

        iv.     **Sale Free and Clear of Unexpired Leases**: The Debtor is seeking to sell the Assets free and clear of any possessory leasehold interest, license, or other right.

        v.     **Relief From Bankruptcy Rule 6004(h)**: The Debtor anticipates the Sale Order will request relief from the fourteen day stay imposed by Rule 6004(h).

## B.     Proposed Bidding Procedures

19. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtor believes the proposed Bidding Procedures, which are annexed as Exhibit 1 to the Bidding Procedures Order, will maximize the realizable value of the Assets. The Debtor seeks to implement a competitive

bidding process, and believes the Bidding Procedures contemplate an auction process pursuant to which bids for the Assets will be subject to higher or otherwise better offers. Consistent with the bankruptcy auction procedures approved routinely in this District, the Debtor believes that the proposed Bidding Procedures are most likely to maximize the realizable value of the Assets.

20. Accordingly, the Debtor believes the Court should approve the Bidding Procedures. Similar procedures have been previously approved by this Court. See, e.g., In re BNA Subsidiaries, LLC, Case No. 10-13087 (BLS) (Bankr. D. Del. February 1, 2011); In re Barzel Industries Inc., et al., Case No. 09-13204 (CSS) (Bankr. D. Del. October 6, 2009); In re Ritz Camera Centers, Inc., Case No. 09-10617 (MFW) (Bankr. D. Del. July 10, 2009); In re Fedders North America, Inc. et al., Case No. 07-11176 (BLS) (Bankr. D. Del. January 9, 2008).

**C.    Notice of Auction and Expedited Sale Hearing**

21. On or before one (1) business day after entry of the Bidding Procedures Order, the Debtor will cause the notice attached as Exhibit 2 to the Bidding Procedures Order (the "Notice of Auction and Expedited Sale Hearing") and the Bidding Procedures Order to be sent by fax, overnight mail, and/or e-mail, to the following parties: (i) the Office of the United States Trustee; (ii) counsel to the RUS (defined below); (iii) counsel to the Federal Communications Commission; (iv) counsel to OEP (defined below); (iv) counsel for the Committee; (v) all taxing authorities having jurisdiction over any of the Assets or a reasonably known interest in the relief requested by the Motion, (vi) all persons known to be interested in purchasing the Assets; (vii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets and (viii) all parties that have requested to receive notice pursuant to Bankruptcy Rule 2002.

22. The Debtor submits that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and other parties in interest, and also to all

10

those that have expressed an interest in bidding on the Assets. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950). Accordingly, the Debtors submit that such notice constitutes good and sufficient notice under the circumstances.

23.     In addition, the Debtor further requests that the Court schedule the Sale Hearing on expedited basis for November 15, 2011 at 2:00 p.m. (ET). Pursuant to Bankruptcy Rule 2002(a)(2), the required twenty-one (21) day notice of the proposed sale of property other than in the ordinary course of business may be shortened for cause shown. See Fed. R. Bankr. P. 2002(a)(2). Here, given the imminent prospect of a shut down of the Debtor's business, the Debtor believes an expedited Sale Hearing on less than twenty-one (21) days notice is warranted. The Debtor further requests that the objection deadline with respect to the Sale of the Assets be at least one (1) day prior to the Sale Hearing.

## BASIS FOR RELIEF REQUESTED

### A.     The Sale of the Assets is Within the Sound Business Judgment of the Debtor and Should be Approved

24.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a Debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have held that a debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan if it demonstrates a sound business purpose for doing so. See In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); see also

11

Committee of Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Titusville Country Club v. Pennbank (In reTitusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate); In re United Healthcare System, Inc., Civil Action No. 97-1159, 1997 WL 176574, at *7 (D.N.J. Mar. 26, 1997); In re Mid-American Waste System, Case No. 97-104 (PJW) (Bankr. D. Del. Mar. 7, 1997).

25.     Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See In re Delaware & Hudson Ry. Co., 124 B.R. at 175 (adopting Lionel factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); see also In re Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business" purpose test); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the articulated business justification test of Lionel standard and adding the "good faith" requirement).

26.     In this case, the Debtor's decision to sell the Assets is indeed based on a several compelling business reasons. First and foremost, the proposed Sale will allow the Debtor to survive as a going concern and avoid an imminent shut down of its network, which would then result in leaving thousands of the Debtor's customers without service. Second, the sale of the Debtor's business as a going concern will allow for the Debtor's remaining Employees to be employed by the Purchaser and thus will benefit many of the Debtor's Employees.

27.     The Bidding Procedures are also designed to maximize the value received for the Assets. The Term Sheet establishes a floor for the purchase price and the Bidding Procedures

12

are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price through the auction and bidding process.

28.     Furthermore, by separate motion (the "Non-Core Asset Sale Motion") [Docket No. 77], the Debtor is seeking to establish procedures for the sale of certain miscellaneous Debtor's assets (the "Non-Core Assets) that are not a part of its core business operations.[6]  In order to eliminate any risk that any sale of the Non-Core Assets will impact the value of the Sale of the Assets that is the subject of this Motion, the Debtor has agreed to not sell any Non-Core Asset prior to the Auction.  This step will also ensure that the Assets will be sold for the highest or otherwise best possible purchase price through the auction and bidding process.

29.     Last, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all interested parties, including those who have previously expressed an interest in purchasing the Assets.  Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable.

**B.     The Proposed Sale Satisfies Section 363(f) of the Bankruptcy Code**

30.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (ii) such entity [holding an interest] consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f) (emphasis added).

---

[6]  The Non-Core Asset Sale Motion is set to be heard by the Court on November 2, 2011.

49524/0001-8009779v5

31.     Since section 363(f) is written in the disjunctive, any of the five conditions,
including the "consent" of the lienholders, provides authority to sell free and clear of liens.  See
Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988); In re
Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009);
In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Eddie
Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del. July 23, 2009); In re Hancock
Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re Copelands'
Enters. Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three A's
Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del. Nov. 17, 2006).

32.     Here, the Debtor believes there are only two parties with secured liens on the
Assets: (a) the Debtor's prepetition lender, the United States Department of Agriculture, Rural
Utilities Service ("RUS"), and (b) the Debtor's postpetition lender, One Equity Partners, III, L.P.
("OEP").  The Debtor believes that both RUS and OEP are supportive of, and will thus consent
to, the Sale of the Assets.  Furthermore, the Debtor will send to any other or purported
lienholders both the Auction and Expedited Sale Hearing Notice and notice of this Motion (with
the Motion and exhibits attached).  Accordingly, the Debtor requests that unless any party (other
than the RUS) asserting a lien in any of the Assets timely objects to this Motion, all such parties
shall be deemed to have consented to the Sale approved at the Sale Hearing.

33.     The Debtor submits that the requirements of Section 363(f) will be satisfied, and
the Court should approve the sale of the Assets free and clear of all lien claims, encumbrances
and other interests, and any liens shall attach only to the proceeds of the Sale in the order of their
priorities, subject to the rights and defenses, if any, of the Debtor and other parties in interest
with respect thereto.

49524/0001-8009779v5

**C.** **The Approval of the Purchaser Protections is Appropriate and**
**in the Best Interest of the Estate.**

34.     While the Debtor has determined in its reasonable business judgment that an
Auction of the Assets at this time will result in the highest and best price for the Assets, such an
Auction would be of little value absent the Stalking Horse setting the minimum Purchase Price
for the Assets under the Term Sheet.

35.     Accordingly, the Debtor hereby requests that the Court approve certain bid
protections to the Stalking Horse consisting of (A) a break-up fee in the amount of 4% of the
Purchase Price (the "Break-Up Fee") and (B) an amount (in no event to exceed $170,000) equal
to the Stalking Horse's actual reasonable and documented expenses incurred in connection with
the Agreement and the transactions contemplated thereby (the "Expense Reimbursement," and
collectively with the Break-Up Fee, the "Purchaser Protections").

36.     The approval of the Purchaser Protections is required to provide the Stalking
Horse with the incentive to be bound by the terms of the Term Sheet prior to the Auction.  This
will establish a floor for the bidding on the Assets, while providing the opportunity for other
bidders to increase the proposed purchase price, and will ensure that the Auction will generate
the highest and best price for the Assets.

37.     In the event that the Purchaser is not the Successful Bidder and the Purchaser
Protections, including the break-up fee, must be paid to the Purchaser, the Debtor and its estate
will have benefited significantly from the higher floor established by the Purchase Price under
the Term Sheet.

38.     In the Third Circuit, an application for a break-up fee is not be treated any
differently from other applications for administrative expenses under section 503(b)(1)(A).  The
determination of whether a break-up fee or expense reimbursement is allowable under section

15

503(b)(1)(A) is made in reference to general administrative expense jurisprudence, and "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 532 (3d Cir. 1999).

39.     This analysis is perfectly appropriate for application to a sale situation between the debtor and a third-party purchaser. As stated in O'Brien, "[w]e assume that bidding at the sale of O'Brien's assets constituted a transaction with the debtor-in possession for purposes of § 503(b)(1)(A)." Id. at 533. Similarly, bidding at a sale of the debtor's assets, where the seller is the debtor-in-possession, constitutes a transaction that may entitle a party to an administrative expense.

40.     In examining the break-up fee at issue in O'Brien, the bankruptcy court identified nine factors that it viewed as relevant in making its break-up fee determination. While not expressly adopting the factors considered by the bankruptcy court as a "test" for all break-up fee determinations, the Third Circuit nevertheless considered those same factors. O'Brien, 181 F.3d at 536. The bankruptcy court's nine O'Brien factors are as follows:

    a.    the relationship of the parties who negotiated the break-up fee;
    b.    effect of break-up fee on bidding;
    c.    reasonableness of amount of the break-up fee;
    d.    importance of fee to competitive bidding;
    e.    will the fee serve to attract other bidders;
    f.    maximization of value to debtors' estates;
    g.    creditor support for the break-up fee;
    h.    availability of safeguards; and
    i.    impact on unsecured creditors.

41.     In the present case, the Purchaser has devoted substantial resources in negotiating the Term Sheet and performing its due diligence on an expedited basis, and without the incentive of the Purchaser Protections, there would be no incentive whatsoever for the Purchaser to enter into a binding purchase agreement prior to the Auction. Approval of

purchaser protections in connection with the sale of significant assets in a situation such as the Debtor faces here is an established practice that will facilitate the Debtor's efforts to assure a sale to a contractually-committed bidder at a price the Debtor believes is fair, while at the same time providing the Debtor with the potential for even greater benefit to the estate from a higher offer.

42.     The proposed Purchaser Protections will not chill bidding and are reasonable and therefore meet the requirements of the business judgment rule, as well as the standard for approval set out in O'Brien. Thus, the Purchaser Protections should be approved.

### D.     Relief from the Fourteen-Day Waiting Period Under Bankruptcy Rule 6004(h)

43.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Banks. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period (now the fourteen-day stay period), Collier on Bankruptcy suggests that the [fourteen (14)] day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

44.     As described above, and in the Edwards Declaration, time is clearly of the essence in this case. If the Debtor is unable to promptly find a purchaser of its Assets, it will be forced

17

to shut down its business and begin a wind-down of its operations. The Debtor needs to close on the Sale within a few days after the Court approves the Sale so that the Debtor reduces the administrative costs of operating its network as a going concern. Furthermore, the Debtor must have the ability to promptly act under the Term Sheet to commence any required or appropriate actions in connection with the Sale. The Debtor therefore requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h).

## NOTICE

45. Notice of this Motion will be given to: (i) the Office of the United States Trustee; (ii) counsel to the RUS; (iii) counsel to the Federal Communications Commission; (iv) counsel to OEP; (iv) counsel for the Committee; (v) all taxing authorities having jurisdiction over any of the Assets or a reasonably known interest in the relief requested by the Motion, (vi) all persons known to be interested in purchasing the Assets; (vii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets and (viii) all parties that have requested to receive notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, under the circumstances, no other or further notice is required.

49524/0001-8009779v5

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, and such other further relief as the Court deems just and proper.

Dated: October 27, 2011  
      Wilmington, Delaware

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**

By: _____

Norman L. Pernick (No. 2290)  
Marion M. Quirk (No. 4136)  
Sanjay Bhatnagar (No. 4829)  
500 Delaware Avenue, Suite 1410  
Wilmington, DE 19801  
Telephone: (302) 652-3131  
Facsimile: (302) 652-3117

Proposed Counsel for the Debtor and Debtor in Possession

49524/0001-8009779v5